William D. HERITAGE and Arline
Heritage, Appellants,

v.

PIONEER BROKERAGE & SALES, INC.
and Moduline Industries, Inc.,
Appellees.

MODULINE INDUSTRIES, INC.,
Cross-Appellant,

v.

PIONEER BROKERAGE & SALES,
INC., Cross-Appellee.

No. 3055, 3087.

Supreme Court of Alaska.

June 1, 1979.

A. Lee Petersen, Inc., Anchorage, for appellants.

M. T. Thomas, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellee and cross-appellant Moduline Industries, Inc.

Michael M. Holmes, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellee and cross-appellee Pioneer Brokerage & Sales, Inc., Juneau.

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR and BURKE, JJ., and DIMOND, Senior Justice.

RABINOWITZ, Justice.

This appeal and cross-appeal arise out of a defense verdict in a personal injury action brought by the Heritages against Pioneer Brokerage & Sales, Inc., the retailer of the Heritages' mobile home, and Moduline Industries, Inc., the manufacturer, alleging defects in the mobile home. Appellants Heritages sought recovery based upon their theory of strict products liability; however, the jury concluded in a special verdict that the mobile home was not defective. Judgment was entered on the verdict in favor of Pioneer and Moduline Industries, and they also were separately awarded costs and attorney's fees against appellants. Subsequently, the superior court granted Pio-

neer's motion for costs and attorney's fees against Moduline and awarded $13,000 to Pioneer, less whatever amount of Pioneer's costs and attorney's fees were to be paid by appellants. From this judgment, the Heritages have appealed the giving of certain jury instructions defining product defectiveness and evidentiary rulings of the superior court, as well as the assessment of costs and attorney's fees against them. Cross-appellant Moduline Industries separately has appealed the award of costs and attorney's fees against it and in favor of Pioneer. We reverse and remand for a new trial based on our conclusion that at least one of the instructions given was erroneous.

In their original complaint, the Heritages alleged that they had purchased a new mobile home from Pioneer which was dangerously defective because of the presence of harmful formaldehyde fumes, and that Arline Heritage had incurred "painful, disabling, and incapacitating personal injuries" as a result of her exposure to the formaldehyde fumes present in the mobile home. Three separate theories of liability were alleged,[1] but shortly before the trial was scheduled to commence the Heritages amended their complaint to delete all claims which were not based upon strict liability. The retailer, Pioneer Brokerage and Sales, Inc., answered and cross-claimed against the manufacturer, Moduline Industries, and asserted its right to recover costs and attorney's fees incurred in defending the action.[2]

On the first day of trial, the Heritages filed a motion requesting the court "to determine the law of the case as it pertains to defenses and damages recoverable under strict liability in tort." After briefing, the superior court ruled that evidence of eco-

---

1. The Heritages' original claims for relief were based upon (1) the separate negligent failures of Pioneer and Moduline Industries in manufacturing, designing, or inspecting the mobile home prior to its purchase by the Heritages and the failure to warn them of its dangerous condition; (2) a breach of warranty; and (3) strict liability in tort.

2. Moduline subsequently filed a third-party complaint against Welsh Corporation, the manufacturer of the paneling used by Moduline in

constructing the mobile home sold to the Heritages. Moduline alleged that if there was a defect, it was entitled to recover based on negligence, warranty, and indemnity theories. Welsh was permitted to add its supplier as a fourth-party defendant. The superior court then ordered a separate trial of all issues between Moduline and the third-party defendants and between Welsh and the fourth-party defendants.

nomic loss would be admissible under the strict liability theory but that evidence of William Heritage's lost wages, due to his return from his job on the North Slope to be with his wife in Juneau, was not admissible.[3] Later, the court ruled that evidence regarding the "unknowability" of the danger inherent in the product would be admissible on the issue of whether the new mobile home was defective.[4] Prior to submitting the case to the jury, the superior court granted Pioneer's motion for a directed verdict against Moduline, concluding that "Moduline should be responsible to indemnify Pioneer for any damages that Pioneer must suffer. . . . "

■ The Heritages' first assignment of error involves the superior court's instructions on strict liability. It is argued that the instructions were erroneous because they improperly introduced negligence concepts into the jury deliberations concerning the alleged design defect. The contested instructions were the following:

Jury Instruction No. 26

Defendants are liable to plaintiffs if it is shown by a preponderance of the evidence that:

(1) the defendants placed the mobile home in question on the market for use, and that the defendants knew or in the exercise of reasonable care should have known that the mobile home would be used without inspection for defects in the particular part, mechanism or design which is claimed to be defective; and

(2) the mobile home was 'defective' in design, manufacture or inspection at the time it was placed on the market and delivered; and

3. The superior court concluded that the loss of wages was governed by the principles of *Rodriguez v. Bethlehem Steel Corp.*, 12 Cal.3d 382, 115 Cal.Rptr. 765, 525 P.2d 669 (1974). The court explained:

> If plaintiffs were able to show that an expert witness . . . would testify that Mrs. Heritage's condition was such that he and only he could give her the assistance that she needed medically, I might take a different view of it. [Unless the plaintiffs could produce such a witness] I think it was their choice as to what they should do with relation to the job, and I don't think that the defendant should be liable for that choice. [I]f nursing care were in fact needed, Mrs. Heritage could recover the value of nursing care for the period of time that was indicated, but I still believe that the *Rodriguez* principle applies here and that I should not allow the showing of lost wages because he had a job that was better somewhere else.

4. The court explained its decision on this point as follows:

> I think . . . that a distinction can be made and should be made between a known defect, either through actual or constructive knowledge, and an unknowable danger—the latter being something I think would be allowed within the *Cronin* California decision [*Cronin v. J. B. E. Olsen Corp.*, 8 Cal.3d 121, 501 P.2d 1153 (1972)] and within the decision of our court. The manufacturer is not an absolute insurer under that doctrine. He would be strictly liable for all dangers that an expert familiar with the product could foresee, but he is not an insurer against all possible dangers. And I think in those circumstances that if an alleged defect is indeed unknowable, that would be a defense and that might be shown first by showing that Mrs. Heritage herself had an identifiable preexisting lung condition that was unique to her which either was the cause of her injury or contributed to it in large measure. There hasn't been any evidence of that I know at this point. I say that's not to be proved by showing there weren't any other cases.
>
> The second way that it might be shown is that the state of the available scientific or medical data was not sufficient—was insufficient to afford the manufacturer even when held to the standard of an expert notice that a particular characteristic of his product might be a defect. I don't know that they could show that because obviously there is evidence that formaldehyde is a danger and it was present and they can't contest that. They had admitted that it was present.
>
> The third possibility might be that the available state of the scientific or medical knowledge would indicate that a reasonable expert in the field, not to this witness but to the expert in the field, that the product alleged to be defective does not pose a threat of injury to users or consumers. In other words, that the type of injury could not be foreseeable and that, therefore, it's not a defect. Such evidence might be considered an issue of causation whether or not what happened here was indeed cause of the injury alleged to be suffered. To that extent, I think knowability is an issue in this case.

(3) the defect, if any, was the proximate cause of the injuries for which damages are claimed.

The product is 'defective' if the amount of scientifically knowable danger inherent in the product at the time it was sold to plaintiffs outweighs the utility of the product as it was designed, manufactured and sold for its intended use.

Jury Instruction No. 29

The maker of an article for sale or use by others must use reasonable care and skill in designing it and in providing specifications for it so that it is reasonably safe for the purposes for which it is intended. And a person who undertakes such manufacturing will be held to the skill of an expert in that business and to an expert's knowledge of the arts, materials and processes. He must keep reasonably abreast of scientific knowledge and discoveries touching his product and of techniques and devices used by practical men in his trade.

Whether a manufacturer's "reasonable care and skill" as an expert in designing a product and its duty to "keep reasonably abreast of scientific knowledge and discoveries . . . and of techniques and devices used by practical men in his trade" are to be considered in a strict products liability action for design defect was settled in our recent decision in *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska, 1979).[5] In the *Beck* case, we expressly rejected the approach taken by some legal commentators of reinserting negligence terminology into the jury's inquiry into the "diverse factors related to the product's desirability and to its dangerousness," which is the crucial analysis in the jury's overall determination that a product's design is defective and the manufacturer should bear legal responsibility for the mistake.[6] We emphasized there that "[t]he focus of strict products liability is on the condition of the product, not on the manufacturing and marketing decision of the defendant."[7] *Beck* adopted the California Supreme Court's guidelines for instructing a jury regarding defectiveness of a product's design as they are articulated in *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978). We held in *Beck* that a trial court may instruct the jury that a product is defectively designed if:

'(1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors,

---

**5.** As a preliminary matter, we note that the Heritages did not specify in their complaint whether they intended their strict liability theory to apply to a manufacturing or a design defect in the mobile home. In their brief to this court appellants argue not that an improper design was chosen, but rather that the Heritages' particular unit failed to meet the quality standards of other identically designed mobile homes manufactured by Moduline; thus implying that only a manufacturing flaw is involved. Neither the pleadings nor the evidence adduced at trial limited the inquiry to manufacturing defects, however. Further, the jury was instructed with respect to the determination of a design defect and the special verdict form which was answered in the negative by the jury merely asked: "Was the new mobile home sold by the defendants to the plaintiffs defective at the time it left the possession of the defendant?"

On this record, it is not possible to determine which theory or theories of strict liability the Heritages were pursuing below; but we must assume that, in order to find for the defendants, the jury must have decided that there was neither a design nor a manufacturing defect in the mobile home based on the instructions they were given. Thus, we find it necessary to decide the propriety of the design defect instruction given in this case in accordance with our decision in *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska, 1979). On remand to the superior court for new trial, the Heritages should indicate formally whether they intend to rely on a theory of design defect before the court decides whether the specific design defect instruction which is approved in this case and in the prior *Beck* decision should be given along with the general instructions relating to manufacturing defects.

**6.** *Caterpillar Tractor Co. v. Beck*, 593 P.2d 883, 884 (Alaska, April 6, 1979).

**7.** *Id.* at 883.

that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.'[8]

Since Jury Instruction No. 29 in the case at bar conflicts with the prohibition articulated in the *Beck* opinion barring the use of negligence concepts in defining a design defect, the judgment of the superior court must be reversed and the case remanded for a new trial on all issues.[9]

■ At the new trial certain evidentiary issues which were raised in the present appeal may recur. Therefore, we deem it expedient to provide guidance on those matters at this time. Appellants assert that the superior court erred in allowing evidence of "scientific unknowability" to be admitted in determining the defectiveness of the mobile home in this strict products liability case. The evidence adduced at trial over appellants' objections apparently consisted of expert testimony to the effect that exposure to the concentrations of formaldehyde which were measured in the Heritages' mobile home for the length of time that the Heritages resided there are not known scientifically to cause permanent deep lung damage of the type suffered by Arline Heritage.[10]

Admission of the bulk of this expert testimony did not constitute error under our decision in *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska, 1979). In *Beck*, we held that the defendant in a strict liability case may prove that the product was not defective by introducing evidence showing the various trade-offs in the design process. We stated there that the fact-finder is required "to consider and compare a number of competing factors, including but not limited to '. . . the mechanical feasibility of a safer alternative design . . . .' "[11] A determination of the "scientific knowability" of the unsafe character of the product is relevant to the above inquiry in that it underlies evaluation of the manufacturer's ability to eliminate the harmful aspects of the product. This is because where no indication of danger exists and no techniques for obtaining such information are available, a manufacturer has no basis for concluding that the product should not be marketed.[12] Thus, we think that "scientific knowability" of the injurious nature of the product should be considered because, otherwise, imposition of liability for a design defect would effectively mean absolute liability even though there is no alternative

**8.** *Id.* at 886, *quoting Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443, 452 (Cal.1978).

**9.** In *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 877 n. 6, the offending instruction was the following:

A manufacturer is strictly liable in tort when an article he places on the market proves to have a defect that causes injury to a human being. . . . In this case, the [p]laintiff has alleged that a design defect proximately caused the death of the deceased. *A design defect is one in which the product, however perfectly manufactured, incorporates or fails to incorporate a design feature with the result that injury is proximately caused thereby.* [emphasis supplied]

In that case, we found that "[b]ecause the jury here was erroneously instructed on causation as the primary definition of defect, the judgment entered against appellant Caterpillar must be reversed." *Id.* at 886.

**10.** This evidence was admitted by the superior court both on the issue of causation of the injuries alleged, and on the question of the defectiveness of the product.

**11.** *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 885–86 (Alaska 1979), *quoting Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443, 455 (1978). Other factors to be considered include the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. *Id.* The trial court approved three specific theories on which evidence of "unknowability" would be permitted. These theories are set out in note 4 *supra*.

**12.** To be distinguished from the concept of "scientific unknowability" is the so-called "state of the art" defense. In *Beck*, 593 P.2d at 887, we held that "the state of the art, or conformity with industry-wide practices will not protect a manufacturer from liability. The jury may consider what other manufacturers were producing insofar as it indicates [technological feasibility of a different design]." (citations omitted)

way for the manufacturer to discover the risk and remedy it. Such a situation would be incompatible with our previous decisions holding that manufacturers are not absolute insurers of their products.[13]

Further, we are not persuaded that consideration of "scientific knowability" would reintroduce elements of negligence concepts into the determination of defectiveness, as the appellants in this case suggest. The balancing should focus on the general state of scientific knowledge about the product and does not turn on the particular manufacturer's level of expertise.

For these reasons, we approve the portion of Jury Instruction No. 26 which stated: "The product is 'defective' if the amount of scientifically knowable danger inherent in the product at the time it was sold to plaintiffs outweighs the utility of the product as it was designed, manufactured and sold for its intended use." We think this instruction is a correct statement of the law in a case where the "knowability" of the dangerous character of the product is an issue. Thus, we also conclude that, to the extent evidence at the new trial focuses on the "knowability" of the danger at the time the product left the manufacturer's possession or control, evidence on that subject is properly admissible.[14]

■ The Heritages also assert error in the superior court's refusal to permit introduction of evidence of economic loss resulting from William Heritage's return to Juneau from his job on the North Slope of Alaska to be with his wife and the consequent reduction in his wages. The Heritages rely on *State v. Stanley*, 506 P.2d 1284 (Alaska 1973), in support of this contention. *Stanley* involved a tortfeasor's damage to a crab vessel and the consequent interference with the owner's means of generating income. In *Stanley*, we stated:

The general principle underlying the assessment of damages in tort cases is that an injured person is entitled to be replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort.[15]

We held in *Stanley* that the anticipated gross earnings of the vessel for the period involved (less the expenditures which would have been chargeable to the owner) were recoverable as damages. Though we continue to agree with the principle espoused in *Stanley*, we think that case is readily distinguishable on its facts from the case at bar. Unlike Mr. Stanley, William Heritage was not prevented directly from pursuing the more lucrative employment on the North Slope. However, in assessing damages, the questions still remain whether Mr. Heritage's change in circumstances is properly attributable to the alleged tort, and whether recovery for the wage differential would represent double recovery.

On these points we are persuaded that even if William Heritage's job change was directly occasioned by the injury to his wife from the defective mobile home, recovery of his lost wages is foreclosed. We reach this conclusion after careful consideration of the double recovery problem which was discussed by the Supreme Court of California in *Rodriguez v. Bethlehem Steel Corporation*, 12 Cal.3d 382, 115 Cal.Rptr. 765, 525 P.2d 669 (1974). In *Rodriguez*, the wife of an employee injured in an industrial accident was permitted to recover damages for loss of consortium resulting from her husband's injury. However, the court rejected a claim for loss of the wife's earnings and earning capacity allegedly incurred when she quit her job to provide nursing services to her husband. The reasons given were the following:

> We do not doubt, as Mary Anne says in her declaration, that no hired nurse or

**13.** *See Beck*, 593 P.2d at 879, and cases cited therein. *See also* P. Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30, 37–39 (1973).

**14.** *See Beck*, 593 P.2d at 886 n. 52, in which we noted that "design defects must be measured by the knowledge and information which exist-

ed when the product left the hands of the manufacturer."

**15.** *State v. Stanley*, 506 P.2d 1284, 1293 (Alaska 1973), *quoting Beaulieu v. Elliott*, 434 P.2d 665, 670–71 (Alaska 1967).

attendant could give Richard the same degree of personal devotion, patience, and understanding that she as a wife can give him. But should he prevail in his own cause of action against these defendants, he will be entitled to recover, among his medical expenses, the full cost of whatever home nursing is necessary. To allow Mary Anne also to recover the value of *her* nursing services, however personalized, would therefore constitute double recovery. For the same reason, Mary Anne cannot recover for the loss of her earnings and earning capacity assertedly incurred when she quit her job in order to furnish Richard these same nursing services. To do so would be to allow her to accomplish indirectly that which we have just held she cannot do directly.

*Id.* 525 P.2d at 687, 115 Cal.Rptr. at 783 (citations omitted). Thus, if William Heritage's lost wages are attributable to his decision to provide nursing services to his wife, he may not be permitted to introduce evidence of the losses at trial.

Appellants assert, however, that there would be no double recovery problem in the present case because they sought only the difference in wages between what Mr. Heritage actually earned in Juneau and what he could have earned in more economically advantageous employment on the North Slope. According to the Heritages, the difference in wages is recoverable without a showing by expert witnesses that Arline Heritage's physical condition and state of mind required Mr. Heritage's presence in Juneau, since it was within the jury's ability to determine this point.[16] We are not persuaded that damages based on this latter theory should be awarded, however, since a determination of when the support of a close family relationship is necessary to the medical and psychological comfort of the injured individual is always an uncertain inquiry, and the extent of such damages attributable to an injury is, in our view, too speculative to be made part of the general recovery of tort victims.

The Heritages also raise as error the superior court's assessment of partial costs and attorney's fees against them;[17] however, in view of our disposition of this case on the merits, and the remand for new trial, we decline to express an opinion on the appropriateness of the award.

The final issue to be addressed was raised on cross-appeal by the manufacturer, Moduline Industries. The superior court awarded full attorney's fees of $13,000 to Pioneer Brokerage, the retailer of the Heritages' mobile home, for its expenses in defending against the Heritages' law suit. The costs and fees were to be recovered from Moduline Industries to the extent they were not recovered from appellants themselves. This order was entered after the jury verdict in favor of the defendants was returned, based on the court's earlier grant of a directed verdict for Pioneer on the issue of indemnity by Moduline for "any damages that Pioneer must suffer" as a result of the instant litigation. In its cross-appeal, Moduline contends that the award of costs and attorney's fees against it was error because: (1) no liability was found, therefore, no right of indemnity arose, and no duty to defend Pioneer existed; (2) tender of defense by Pioneer to Moduline did not create a basis for taxing costs and fees to Moduline on its refusal to undertake the defense; and (3) Pioneer was not a prevailing party within the meaning of Alaska Rule of Civil Procedure 82.

Ordinarily, Civil Rule 82 governs the award of attorney's fees in an action. The purpose of Civil Rule 82 is to compen-

---

**16.** The superior court had ruled that William Heritage could recover the difference in wages only if an expert witness testified that Arline's medical condition required assistance that only her husband could provide. This portion of the superior court's ruling is quoted in note 3 *supra.*

**17.** The Heritages argue that the size of the award of costs and attorney's fees infringes constitutional equal protection guarantees by

sate partially a prevailing party;[18] thus, full attorney's fees are never awarded absent "justification" and consideration of the "good faith" nature of the unsuccessful party's claim or defense.[19] However, in this case we find that the right to indemnity, determined by the superior court to include any damages recovered by appellants on their products liability claim, controls recovery of costs and attorney's fees as a matter of policy. Therefore, Civil Rule 82 has no application in this case.[20]

In reaching this decision, we think *Manson-Osberg Co. v. State*, 552 P.2d 654 (Alaska 1976), is particularly persuasive. The *Manson-Osberg* case involved a suit by a bridge contractor's employee against the State of Alaska for vicarious liability and negligence. The state brought a third-party action for indemnity from the contractor under an express indemnity clause in the contractor's construction contract with the state. We upheld the validity of the "hold harmless" indemnity clause and further held that the contractual indemnity clause "should include the cost of recovery on the clause itself, as a matter of policy." *Id.* at 660 (footnote omitted). The reasons for the

inclusion of costs and attorney's fees in the indemnity clause's coverage were articulated as follows:

> The hold harmless clause required that the contractor shall save harmless the government from all suits, actions, or claims of any character brought on any account of injuries or damages sustained by any person. The government is not held harmless if it must incur costs and attorney's fees in bringing suit to recover on the indemnity clause. The contractor on the other hand can avoid such costs and attorney's fees by paying the amount due without the necessity of suit.[21]

Though cross-appellant Moduline Industries correctly points out that the *Manson-Osberg* case involved an express contractual indemnity clause while the present case involves an implied right of indemnity based on the relationship between the retailer, Pioneer Brokerage and Sales, Inc., and the manufacturer, Moduline Industries, Inc.,[22] we think that the reasoning of the *Manson-Osberg* case is equally applicable to both situations. Numerous other jurisdictions have drawn no distinction between indemnity actions that arise out of the express

---

chilling their redress of wrongs through the judicial process.

**18.** *E. g., Hausam v. Wodrick*, 574 P.2d 805 (Alaska 1978); *Malvo v. J. C. Penney Co.*, 512 P.2d 575, 587 (Alaska 1973). *See Preferred Gen. Agency of Alaska, Inc. v. Raffetto*, 391 P.2d 951 (Alaska 1964).

**19.** *Malvo v. J. C. Penney Co.*, 512 P.2d 575, 587 (Alaska 1973). In *Malvo* we recognized the detriment to the judicial system which would result where, "in order to seek judicial remedies, a plaintiff must risk liability for the full amount of attorney's fees the other side sees fit to incur . . . .. [If this were the case,] it takes little imagination to foresee that the size a party's bank account will have a major impact on his access to the courts."

**20.** Specifically, Alaska R.Civ.P. 82 does not apply to the award of costs and attorney's fees incurred by Pioneer in defending the Heritages' strict products liability suit. There is no serious contention that Pioneer's negligence contributed to Arline Heritage's injuries; in fact, the Heritages abandoned their claims of negligence and breach of warranty against both defendants before the trial commenced. Therefore, the costs and fees expended by Pioneer in defending the action were properly attributed

to Moduline's own defense in this case. We note, however, that in other factual circumstances cases may exist in which the indemhitee's actual concurrent wrongdoing might preclude it from recovering from an indemnitor. *See, e. g., Insurance Co. of North America v. King*, 340 So.2d 1175 (Fla.App.1976).

Civil Rule 82 also does not apply to the costs and attorney's fees incurred in establishing the right to indemnity. *See Manson-Osberg Co. v. State*, 552 P.2d 654, 660 (Alaska 1976), discussed *infra*.

**21.** *Id.*

**22.** The *Manson-Osberg* case, *id.*, also is factually different because it involves a claim for costs and attorney's fees in the indemnity action itself, while the present case involves the fees incurred directly in defense of the claim giving rise to the right to indemnity. We see no reason for distinguishing the two types of attorney's fees, however, and indeed, we recognize that in many cases it would be difficult to separate the expenses involved in each claim, since they are frequently tried simultaneously and may involve proof of overlapping issues of fact. *See* note 20 *supra*.

provisions of a contract and those that are implied in law.[23] Indeed, the general rule seems to be:

> [I]n actions of indemnity, brought where the duty to indemnify is either implied by law or arises under contract, and no personal fault of the indemnitee has joined in causing the injury, reasonable attorneys' fees incurred in resisting the claim indemnified against may be recovered as part of the damages and expenses.[24]

■ Moduline argues, however, that because the defendants in this case successfully contested the Heritages' law suit, that no right of indemnity arose and, therefore, Moduline should not be required to reimburse Pioneer's expenses in defending the action. We think that the attempt to draw a distinction along these lines is without merit. In the first place, Moduline owed Pioneer a duty to defend the strict products liability suit; that much is established by the directed verdict which was entered in Pioneer's favor by the superior court.[25] Further, Moduline could have avoided assessment of attorney's fees by taking over defense of the Heritages' claim when it was tendered by Pioneer, but it declined to do so.[26] If the right to costs and attorney's fees for defending the law suit is made contingent on losing on the merits of that action, in every case the indemnitee would be put in the difficult position of attempting to show lack of his own culpability at the same time that he is aiding the plaintiff's case by attempting to prove the liability of his indemnitor. Such a situation certainly would be contrary to both the indemnitee's and the indemnitor's interests in many instances, and we decline to create an incentive for accomplishing that result. Thus, we hold that where indemnification is required, and the indemnitor has been given proper notice of the pending litigation and an adequate opportunity to undertake its duty to defend, the indemnitee is entitled to recover full costs and attorney's fees for the expenses of its successful defense of the action giving rise to the claim for indemnity.[27]

The judgment of the superior court is Reversed as to the Heritages' appeal and Remanded for new trial, and Affirmed as to the cross-appeal.

MATTHEWS, J., not participating.

---

**23.** See, e. g., Central Soya Co. v. Cox Towing Corp., 431 F.Supp. 502 (N.D.Miss.1977); Davis v. Air Technical Indus., Inc.,, 67 Cal.App.3d 701, 136 Cal.Rptr. 799 (1977); Sendroff v. Food Mart of Connecticut, Inc., 34 Conn.Sup. 624, 381 A.2d 565 (1977); Borg-Warner Acceptance Corp. v. Philco Finance Corp., 356 So.2d 830 (Fla.App.1978); Kerns v. Engelke, 54 Ill.App.3d 323, 12 Ill.Dec. 270, 369 N.E.2d 1284 (1977); Addy v. Bolton, 257 S.C. 28, 183 S.E.2d 708 (1971); Scherf v. Myers, 258 N.W.2d 831 (S.D. 1977).

**24.** Addy v. Bolton, 257 S.C. 28, 183 S.E.2d 708, 710 (1971). See also 22 Am.Jur.2d, Damages, § 166, at 236. A proviso to this rule, requiring that the party seeking indemnification be free from personal negligence in his own dealings with the injured party, is satisfied here. See note 20 supra. Further, Moduline obviously had notice of the Heritages' suit since it was named a party defendant, and was given the opportunity to defend the action by Pioneer's tender of defense in the early stages of the litigation. Moduline declined this tender of defense in writing on September 19, 1975, nearly nine months before trial commenced, and Pioneer actively proceeded to defend the case.

**25.** The granting of the directed verdict on indemnity has not been appealed to this court. Only the attorney's fees issue is properly before us, therefore.

**26.** See note 24 supra.

**27.** As further support for our decision, we note the cases which have held that where an indemnitee makes a good faith settlement with the injured party, he is not precluded from seeking indemnity by the fact that he declined to assume the absolute risk of being made responsible in law for the actual amount of the damages. See B & E Installers v. Mabie & Mintz, 25 Cal.App.3d 491, 101 Cal.Rptr. 919 (1972). See also Great Western Furniture Co. v. Porter Corp., 238 Cal.App.2d 502, 48 Cal. Rptr. 76 (1965); Pac. Tel. & Tel. Co. v. Pac. Gas & Elec. Co., 170 Cal.App.2d 387, 338 P.2d 984 (1959). But see Raynolds v. Volkswagenwerk Aktiengesellschaft, 275 Cal.App.2d 997, 80 Cal. Rptr. 610 (1969). We also note that where the indemnitee has been exonerated and the indemnitor has been held liable to the plaintiff in an action, the indemnitee has been permitted to recover attorney's fees for his participation in the defense of the indemnitor. Addy v. Bolton, 257 S.C. 28, 183 S.E.2d 708 (1971).