Christopher M. SNOWDEN, a minor, By and Through his Natural Guardian and Next Friend, Teresa A. (Snowden) VICTOR; and United States of America, Plaintiffs,

v.

CONNAUGHT LABORATORIES, INC., a Delaware Corporation; Connaught Laboratories, Ltd., a Canadian Corporation, Defendants.

Civ. A. No. 89–1341–T.

United States District Court, D. Kansas.

April 26, 1991.

Andrew W. Hutton of Michaud, Hutton and Bradshaw, Wichita, Kan. and Ted Warshafsky of Warshafsky, Rotter, Tarnoff, Gesler, Reinhardt & Bloch of Milwaukee, Wis., for plaintiffs.

Thomas J. Lasater and David G. Seely, of Fleeson, Gooing, Coulson & Kitch and Mike Barkley, Pete Silva, Jr. and Jay B. Whites, Jr., of Barkley, Rodolf, Silva, McCarthy & Rodolf, Tulsa, Okl., for defendants.

## MEMORANDUM AND ORDER

JOHN B. WOOLEY, United States Magistrate Judge.

Plaintiffs have filed a Motion to Compel Defendant to Produce Documents Requested in Plaintiffs' Fifth Request for Production to Defendant Connaught Laboratories, Inc. and Plaintiffs' Second Request for Production to Defendant Connaught Laboratories, Ltd. (Dkt. # 66, filed March 15, 1990), with Memorandum in Support thereof (Dkt. # 67, filed March 15, 1990). Defendants have filed a Motion for Protective Order (Dkt. # 89, filed April 24, 1990) and a Memorandum in Opposition to Plaintiffs' Motion (Dkt. # 87, filed April 20, 1990) and plaintiffs filed a Response (Dkt. # 93, May 7, 1990).

Christopher Snowden was inoculated with DPT vaccine on February 10, 1984, at Bassett Army Clinic, Fort Wainwright, Alaska. Plaintiffs claim that prior to his

inoculation, Christopher was a normal, healthy, child, but as a result of the DPT vaccination, he suffered permanent injuries. Plaintiffs traced the source of the vaccine to Connaught Laboratories, Inc. (hereinafter referred to as "CLI"), a wholly owned subsidiary of Connaught Laboratories Ltd. (hereinafter referred to as "CLL"). (Both CLI and CLL are sometimes hereinafter also referred to as "Connaught".) Plaintiffs filed this suit, asserting that the DPT vaccine was unreasonably and unnecessarily dangerous. Plaintiffs contend that instead of using a "whole cell" DPT vaccine, a safer alternative existed, that of an acellular (or less than "whole cell") vaccine. Plaintiffs premise their allegations on theories grounded in strict liability in tort (Section 402A of the Restatement (Second) of Torts), negligent design, breach of implied and express warranties, and failure to provide proper warnings.

In their Fifth Request for Production addressed to CLI and their Second Request to CLL plaintiffs requested the following:

1. All documents dated up to and including the current date regarding Connaught's research into the development of an acellular pertussis vaccine.

2. All documents dated up to and including the current date regarding Connaught's research into the development of the Biken antigen or vaccine.

CLI and CLL object to the production of any of the material requested because of "its highly confidential nature and the undeniable harm that its release would cause to defendants in the highly competitive pharmaceutical market". In turn, CLI and CLL seek a Protective Order prohibiting discovery of:

... any current research being undertaken by CLI or CLL concerning use or development of a non-whole-cell pertussis vaccine, as well as any Biken formula vaccine.

Plaintiffs argue that the documents and records pertaining to acellular and Biken research are vital to their ability to demonstrate that a safer, more feasible alternative existed to the whole-cell vaccine and to counter Connaught's defenses. The broad time frame for the research requested is to ascertain not only if, but also *when* Connaught had the technological capability to produce an acellular vaccine. They argue that they need to establish if the current research being conducted is, in fact, new, or if it is a continuation of research initiated in earlier years, and therefore they require access to Connaught's research before and after 1984. At the core of plaintiff's contentions is that CLL/CLI had the capability of producing a safer vaccine prior to 1984, but, because of cost factors (see Exhibit E, Docket #93), declined to do so. Even though plaintiffs do not concede that the research materials constitute confidential trade secrets, they do not oppose an appropriately drafted protective order and cite cases where DPT manufacturers have been ordered to produce research materials.

The Biken pertussis antigen (an acellular vaccine) is manufactured by Biken Co. of Japan and plaintiffs claim that Connaught is currently conducting research whereby the Biken pertussis component is mixed with Connaught's Diphtheria and Tetanus portions. Plaintiffs argue that they should be entitled to discover the current research in this area because Connaught does not have the rights to the Biken formula, but is merely combining the components to produce a DPT vaccine. Plaintiffs contend that the ingredients of the Biken formula, invented by Dr. Sato, have been patented, and that it is the production process in manufacturing Biken that is the real secret.

Plaintiffs also argue that research should be produced from both CLI and CLL, because they believe that CLL controlled all the research funds for both companies. Plaintiffs further argue that if, at trial, Connaught denies the feasibility of producing a safer product, the existence of remedial measures taken to correct the product would be admissible, therefore research after 1984 is highly relevant. Furthermore, plaintiffs state that expert testimony relies upon the production of this research to evaluate the research results and to be able to render an opinion.

Connaught argues that the research material requested is not relevant to the determination of the feasibility of Connaught producing a safer vaccine in 1984. Defendants argue that the FDA has not licensed any acellular vaccine, therefore such a vaccine was not a feasible alternative. Connaught admits that CLI investigated the use of a less than whole cell pertussis vaccine in 1980, 1981, 1982 and 1986. Connaught contends that beginning in 1980 they experimented with "extracted" or "split cell" vaccines, but those efforts were not successful and that plaintiffs' counsel has already been provided with the materials concerning this research. Connaught insists that any research after 1984 is irrelevant and that "state of the art" evidence as to the feasibility of an alternative design is applicable only at the time the product was distributed and argues that any evidence of subsequent modification is inadmissible evidence based upon public policy, which encourages manufacturers to improve their products. Connaught states that plaintiffs' counsel have asked for the identical information in a companion case currently pending in the United States District Court of the District of Oregon, *Hineline v. Connaught*, CCIV No. 88-6751-B. By agreement of counsel discovery is being conducted jointly in the two cases. In *Hineline*, the Oregon court, defendant contends, denied plaintiffs' request for the same information sought here.

Connaught states that research concerning the efficacy of DTP vaccine is an *ongoing process* (Dkt. # 87 at p. 11) spanning many years and that to date, the technology and experimentation have not reached the point that an alternative, safe formula can be put into commercial use. Connaught states that the product on the market today (and the only one for which a valid United States license exists) is the "whole cell" vaccine, and that the vaccine, that was used to inoculate Christopher Snowden has not changed.

Connaught argues that plaintiffs' position that evidence of Connaught's current research will be admissible at trial pursuant to the exception under Federal Rule of Evidence 407, is incorrect. Connaught argues that Fed.R.Evid. 407 has no application because there has been no subsequent improvement of the product and that a "safer" or improved vaccine would be an entirely different product.

With respect to plaintiffs' request pertaining to the Biken research, Connaught argues that they are operating under a confidentiality agreement with the Japanese manufacturer and Connaught could not divulge any information it has concerning the Biken secret formula or production process without violating this agreement.

Connaught further contends that its experimental acellular pertussis vaccine, as well as the Biken formula, constitutes highly confidential trade secret information, and in a highly competitive pharmaceutical market, disclosure of this information, undertaken by Connaught at substantial long-term investment, would be extremely damaging; that any need plaintiffs can demonstrate is outweighed by the potential injury to Connaught; that there is a strong public policy to protect trade secrets so that drug manufacturers will not be discouraged or hampered in their research for safer, more effective products; that they will suffer financial losses if their trade secrets are discovered by a competitor, and point to the deposition of Dr. Mark R. Geier, (one of plaintiffs' counsel's previous and currently utilized experts), which was taken in *Ziesemer v. Connaught, Inc., et al.*, Superior Court of Washington for Thurston County, Cause No. 86-2-01113-4, whereby Connaught states Geier is a potential competitor. Therefore, Connaught argues that Geier should not be allowed access to their trade secrets.

Connaught argues that the "state of art" technology available in 1984 is obtainable from publicly available scientific literature and plaintiffs have not demonstrated the need for information pertaining to Connaught's research. Connaught states that disclosure is only appropriate if the need for the information outweighs the burden and risk of disclosing it and adequate means are employed to prevent its dissemination and misuse. Connaught cites cases where courts have characterized acellular

**340**

research as trade secrets and confidential information, subject to an appropriate protective order. Where courts have permitted discovery, it has only been under the most stringent protective orders.

Plaintiffs counter in their Response that, contrary to Connaught's assertion that acellular vaccines were not permitted in 1984, the Food and Drug Administration defines the Pertussis vaccine as "... *either killed whole Bordelella pertussis bacteria or a fraction of Bordelella pertussis* bacteria." 21 C.F.R. § 620.1 (1984). Therefore, even if such a vaccine was not licensed, the federal regulations existing in 1984 allowed for such licensing. Plaintiffs further argue that defendants are incorrect when they state that no acellular pertussis has ever been licensed for use in this county, because Lilly Tri–Solgen, a noncellular vaccine, was on the market between 1964 and 1976.

Plaintiffs also point to testimony proffered to the FDA in 1982, from Connaught that "... we do have an acellular pertussis vaccine which is substantially LPS reduced. The tests that are outlined here are intended to establish the superiority of this vaccine over the current whole cell product." (Exhibit C2 to docket #93). Plaintiffs add that Connaught's own personnel admitted that they had the ability to produce an acellular vaccine, but did not do so because of cost factors. (Exhibit E to docket #93). Plaintiffs believe that the current technology to create an acellular vaccine was available to Connaught in the 1940's, 1950's and 1960's, but they need the acellular research records and documents from the defendant in order to conclusively prove this point.

Plaintiffs counter that Connaught's assertion that Dr. Geier will be a competitor is blatantly untrue, and demonstrate, by Affidavit of Dr. Geier, that he has absolutely no interest in competing in the DPT marketplace.

At the outset, the court notes that Connaught points out that neither CLI nor CLL admit that Christopher Snowden received a DPT vaccine manufactured by either company and that plaintiffs are not contending that *CLL* (the Canadian corporation) supplied Bassett Army Clinic with any DPT vaccine. Connaught raises this issue merely by footnote in their Memorandum Brief in Response to Plaintiff's Motion to Compel (see Dkt. #87 at page 2). Plaintiffs contend that depositions and documents from the Contracting Officer and Purchaser of the U.S. Government Defense Personnel Support Center, reveal that during a two year period of 1982 through 1984, the government purchased their DPT vaccine from CLI, through Elkins–Sinn, a distributor (Dkt. #67 at page 2).

▆ Plaintiffs state that CLI was acquired by CLL in 1978 and the reason for requesting discovery from both CLI and CLL is that plaintiffs believe CLL controlled the purse strings for research conducted by both CLL and CLI. Plaintiffs also contend that significant research to improve whole cell pertussis vaccine originated at CLL, and that they have testimony of the cooperation between the two companies concerning research and clinical testing of acellular pertussis. Plaintiffs add that CLL had all the capital, facilities and equipment to undertake significant acellular research. CLI is wholly owned by CLL. Connaught does not expound on this issue at any length, but merely delegates a short footnote to the discoverability of research and documents from CLL. CLL remains a party to this case. CLL's records cannot be summarily excluded, based on the arguments presented, from consideration as a source of information, possibly relevant to the subject matter of this case. There being no serious contention to the contrary, the court finds that the relationship between CLI and CLL, with regard to the financing and research pertaining to the DPT vaccine and the Biken product, is sufficiently close and interconnected that disclosure of the records of both entities are necessary to the full and complete disclosure of the information encompassed within the scope of plaintiffs' Requests for Production.

a. Relevancy:

▆ Relevancy has been defined under Rule 26(b)(1) by the United States Supreme

Court as encompassing any matter that bears on, or reasonably could lead to other matters that could bear on, any issue that is or may be in the case. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). A request for discovery should be considered relevant if there is any possibility the information sought may be relevant to any issue in the case and discovery should ordinarily be allowed unless it is clear that the information sought can have no possible bearing on the subject matter of the action. *Gagne v. Reddy,* 104 F.R.D. 454 (D.Mass.1984); *Roesberg v. Johns Manville Corp.,* 85 F.R.D. 292 (E.D.Pa.1980); *Miller v. Doctor's General Hospital,* 76 F.R.D. 136, 138 (W.D.Okla.1977).

Though there may be other reasons why the records and documents sought should not be produced, it appears obvious to the court, given the above guidelines, that the information plaintiff seeks fully meets the tests for relevancy under Rule 26 and the applicable case law.

b. Applicable Law:

Although the parties do not expressly so stipulate, it appears, from the arguments of both sides that they probably agree that Alaska law is applicable.

In Footnote 5 on page 8 and on pages 8 and 9, respectively, in defendants' brief (Dkt. # 87), Connaught states:

The substantive law to be applied in this case is Alaska law since the vaccine was administered there and plaintiffs reside there. (Footnote 5), and

In cases involving a product alleged to have been defectively designed, courts in Alaska, as elsewhere, adhere to the principles enunciated in the Restatement (Second) of Torts § 402A. See *Butaud v. Suburban Maine [Marine] & Sporting Goods, Inc.,* 543 P.2d 209 (S.Ct. Alaska 1975), following and adopting Oregon substantive law; *Clary v. Fifth Avenue Chrysler Center, Inc.,* 454 P.2d 244 (Alaska 1969), and *e.g. McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 790 (Tex. 1967). Since Alaska law follows Oregon law on the topic, Oregon law is instruc-

tive. To sustain a design defect claim under Oregon law, the plaintiffs must demonstrate that *in 1984* there was a safer available alternative design. *Krause v. American Aerolights,* 307 Or. 52, 762 P.2d 1011 (1988). (Pages 8 and 9.)

The point appears to be to persuade the court that Oregon substantive law is controlling because Alaska adopts and follows Oregon law.

The court agrees that Alaska law is applicable in this case, however it does not agree that *Butaud* or *Clary* or *McKisson* follow and adopt Oregon substantive law. The court also does not agree that the *Krause* case is authority for defendants' statement that "To sustain a design defect claim under Oregon law the plaintiffs must demonstrate that *in 1984* there was a safer available alternative design."

The court also does not agree with defendants' statement that "... Courts in Alaska, as elsewhere, adhere to the principles enunciated in the Restatement (Second) of Torts § 402A", pertaining to strict liability. To the contrary, Alaska appears to have adopted the strict liability concept and follows the Restatement, *with some exceptions.* See *Swenson Trucking & Excavating, Inc. v. Truckweld Equipment Company,* 604 P.2d 1113, 1116 (S.Ct. Alaska 1980), and Footnote 5 in which the court states "We have rejected the requirement that the product be 'unreasonably dangerous.' " citing *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 878 (Alaska 1979) and other cases.

In *Butaud* (page 213 of the P.2d citation) the Supreme Court of Alaska stated:

The appellant contends that the approach to strict liability in products liability cases as announced in California in *Greenman v. Yuba Power Products, Inc.* was adopted for Alaska in *Clary v. Fifth Avenue Chrysler Center* rejecting the approach of § 402A of the Second Restatement of Torts which required the plaintiff to prove the product was unreasonably dangerous or unsafe before he could recover. (Underlining added.)

Later on the same page, the court states:

However, because this issue will again arise on retrial of this case, we are inclined to indicate which doctrine should be followed in Alaska. We thus announce that this court will follow the view taken by the California Supreme Court in *Greenman, Cronin* and *Luque.*[1]

The *Greenman* approach to products liability cases requires the plaintiff to prove that the product is defective and the defect is the proximate cause of injuries.

In Footnote 19 to the paragraph last quoted, the court gives the citation of the *Greenman* case (27 Cal.Rptr. at 700, 377 P.2d at 900) and quotes from that case as follows:

A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. (Underlining added.)

Later, on page 214, the court stated:

We conclude that the policy decisions made by this court ... are better served by the *Greenman–Cronin–Luque* line of cases. On retrial this view should be followed by the trial court.

The case was reversed and remanded for a new trial. The case was later again appealed to the Alaska Supreme Court and is reported at 555 P.2d 42. That appeal had to do with the application of the comparative negligence law, recently adopted at the time, by Alaska, as it affected the strict liability law of Alaska. The opinion reported at 555 P.2d 42 is not relevant to the issues in the instant discussion.

The *Clary* case cites *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal. Rptr. 697, 700, 377 P.2d 897, 900 (1962) and *Vandermark v. Ford Motor Company,* 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964), both of which are California cases, as the basis for its decision, stating:

We have considered appellees contentions but are of the view that the doctrine of strict liability in tort as defined

in *Greenman* affords the most logical, least technical and most comprehensive coverage with respect to the factual situations where it is applicable.

The *Clary* court goes on to hold that *Greenman* is applicable in that case, concluding that the trial court's failure to instruct on strict liability was prejudicial to the appellant Clary. Nothing in the *Clary* case indicates the court relied on Oregon law.

The *McKisson* case appears to rely on Texas law although the *Greenman* and *Vandermark* California cases are mentioned in footnote 2 which, along with the other cases and authorities there cited, the court refers to as being those "authorities and treatises deemed most important and persuasive in bringing the doctrine [of strict liability] to its present status." No mention is made in the *McKisson* case of Oregon law.

The court has been unable to find any later Alaska cases in which strict liability was involved, that changes Alaska law as reflected in *Butaud, Clary, Greenman, Cronin* and *Luque.* There can be no mistake, Alaska follows California law, not Oregon law.

■ Likewise there can be no question that under Alaska law, following California law, the plaintiff need not prove the product was "unreasonably dangerous or unsafe" as required by the Restatement, rather plaintiff need only prove that the product had "a defect that causes injury to a human being".

Defendants claim that the *Krause* case is authority for the principle attributed to it, is little short of shocking. In *Krause* plaintiff filed suit against defendant based on the theory of strict liability and failure to warn growing out of injuries he sustained in the crash of an ultra light aircraft manufactured and sold to him by defendant. Plaintiff claimed the crash was caused by an alleged defect in the wing which tore in flight. The trial court declined to admit evidence of remedial mea-

1. See *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972) and *Luque v. McLean,* 8 Cal.3d 136, 104 Cal.Rptr. 443, 501 P.2d 1163 (1972).

sures taken by defendant after the crash in the form of issuance of a repair kit and service bulletins pertaining to the defect in the wing claimed in plaintiff's case. The case was tried to a jury which returned a verdict for defendant. Plaintiff appealed claiming error of the trial court in excluding evidence of the subsequent repair kit and service bulletins issued by defendant. The Court of Appeals reversed, holding the trial court erred in excluding such evidence.

On appeal by the defendant, the Oregon Supreme Court reversed the Court of Appeals and held the trial court was correct in excluding from consideration the repair kit and service bulletins, based on Oregon Evidence Code, Rule 407, which appears to be identical to Federal Rule of Evidence 407. The Oregon Supreme Court held that Rule 407 resulted from a strong legislative social policy to encourage people to make repairs after an accident, and was apparently concerned that if this type of post-accident repair evidence is admitted persons might be dissuaded from taking the necessary steps to avoid future accidents. (Page 1015).

The court went on to state:

We think this is a weak basis for a rule but it is not for us to second guess the legislative policymakers. Other courts have done so. Most state courts have held the equivalent of OEC 407 inapplicable to strict liability cases. (See footnote 6.)

In footnote 6, the court cites, among other cases, *Dura Corp. v. Harned,* 703 P.2d 396, 411 (Alaska, 1985); *Caterpillar Tractor Company v. Beck,* 624 P.2d 790 (Alaska 1981), and *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1975).

Nothing the court can find in the *Krause* case, or the footnotes thereto, lends any support whatever to defendants' claim that it is authority for the statement that "to sustain a design defect claim under Oregon law, the plaintiffs must demonstrate that *in 1984* there was a safer available alternative design."

On page 9 of defendants' brief (Dkt. # 87) they argue:

The only proof which could support plaintiff's design defect claim, therefore, would be evidence that Connaught was both technologically and legally capable of producing and marketing an alternative pertussis vaccine, as efficacious and safer than the whole-cell pertussis vaccine, at the time of Christopher Snowden's innoculation. Plaintiff must look to alternative vaccines *available* in 1984, and the state of vaccine technology at that time. Because neither CLI, CLL, nor anyone else could have marketed an acellular vaccine in the United States in 1984, information regarding CLI or CLL's acellular research is neither relevant to any of the issues in this case, nor reasonably calculated to lead to discovery of admissible evidence.

The court does not disagree with what defendants state, however defendants' argument simply begs the question. How are plaintiffs to present evidence tending to show that Connaught was "both technologically and legally capable of producing and marketing an alternative pertussis vaccine as efficacious and safer than the whole-cell pertussis vaccine, at the time of Christopher Snowden's innoculation" unless plaintiffs are able to discover through an examination of plaintiff's records and documents, whether or not that statement is true? Must plaintiffs take defendants' word that "neither CLI, CLL, nor anyone else could have marketed an acellular vaccine in the United States in 1984". The court believes not. If the court accepts defendants' argument, then *defendants* are deciding what is relevant. The decision as to what is relevant, for discovery purposes, must be decided by the court, not by a party.

On pages 10 and 11 of their brief in opposition, defendants discuss the "state of the art" defense and the "scientific knowability" defense. Their argument is as follows (quoting from page 10):

What 'state of the art' simply means is what could have been done with due deference not only to the possible, but also to the technically feasible and the com-

mercially practical. *Halphen v. Johns–Manville Sales Corp.*, No. 82–3388 [752 F.2d 124] (5th Cir. Jan. 23, 1985) (en banc) (recalling panel opinion reported at [*Halphen v. Johns–Manville Sales Corp.*,] 737 F.2d 462 [(5th Cir.1984)]), *Hayes v. Ariens Co.*, 391 Mass. 407, 462 N.E.2d 273 (1984), *Carther [Carter] v. Johns–Manville Sales Corp.*, 557 F.Supp. 1317 (E.D.Tex.1973 [1983]). Stated otherwise, the question is whether the product was made as good as it could have been made at the time it was made. If so, liability should not attach to the product unless it is determined that the product was in fact so unjustifiably dangerous that the manufacturer is liable for having made it at all, even though it was made as good as it could have been made. Of course, plaintiffs do not contend that the product should not have been made at all; rather, as stated, they contend that the product was not made as good as it could have been made *at the time it was made* in view of alleged technically feasible and commercially practical alternatives.

The state of the art defense should not be defined as 'what was being done' in the industry but rather 'what could have been done.' *Robinson v. Audi*, 739 F.2d 1481 (10th Cir.1984), and *O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d [298] (1983).

The court suggests that the above cited cases are not applicable since Alaska law is controlling. In addition, defendants appear to confuse the two theories and merge them into one.

Further, Alaska law does not seem to conform to plaintiffs' argument. The Alaska Supreme Court addressed the defenses of "scientific knowability" and "state of the art" in connection with alleged design defect cases in *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (S.Ct. Alaska 1979) and *Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059 (S.Ct. Alaska 1979).

In *Beck*, the court held, among other things, that the state of the art, or conformity with industry-wide practices will not protect a manufacturer from liability. (Page 887). That principle was confirmed and approved in the *Heritage* case wherein the court stated, on page 1063:

A determination of the 'scientific knowability' of the unsafe character of the product is relevant to the above inquiry in that it underlies evaluation of the manufacturer's ability to eliminate the harmful aspects of the product. This is because where no indication of danger exists and no techniques for obtaining such information are available, a manufacturer has no basis for concluding that the product should not be marketed. Thus we think that 'scientific knowability' of the injurious nature of the product should be considered because, otherwise, imposition of liability for a design defect would effectively mean absolute liability even though there is no alternative way for the manufacturer to discover the risk and remedy it. Such a situation would be incompatible with our previous decisions holding that manufacturers are not absolute insurers of their product.

On the same page in Footnote 12 to the above quote, the court states:

To be distinguished from the concept of 'scientific unknowability' is the so-called 'state of the art' defense. In *Beck*, 593 P.2d at 887, we held that 'the state of the art' defense, or conformity with industry-wide practices will not protect a manufacturer from liability. The jury may consider what other manufacturers were producing insofar as it indicates [technological feasibility of a different design].

In any event, both the "scientific knowability" and the "state of the art" defense arguments are properly addressed to the ultimate (temporal) authority, the trier of fact. Both are defenses to plaintiffs' claims. They are not reasons relevant to the question of whether plaintiffs should be allowed to discover the facts upon which those defenses rest. Plaintiffs' motion goes to the question of discovery of facts, not whether those facts, once presented to the trier of fact, will or will not be accepted as a defense to the claim. In short, the issue before the court pertains

to *discovery* not defenses. Whatever reasons, therefore, there may be for denying plaintiffs' motion, it is clear it should not be denied based on defendants' "scientific knowability", or "state of the art" arguments.

■ Defendants also argue that application of Federal Rule of Evidence 407 operates to preclude plaintiffs from discovering the documents sought. The rule is:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Alaska has adopted Rule 407 (see *Kaatz, Admin. v. State,* 540 P.2d 1037, 1043 (Alaska 1975) and *Caterpillar Tractor Co. v. Beck,* 624 P.2d 790, 793–94 (Alaska S.Ct. 1981)). Plaintiffs argue that evidence of "subsequent measures" taken by Connaught (i.e. after 1984) should be discoverable so plaintiffs can offer such evidence to attempt to prove that it was feasible, prior to 1984, for Connaught to have then manufactured and marketed a safer vaccine. Connaught's response is that there have been no improvements to the vaccine subsequent to 1984, therefore the feasibility of precautionary measures has nothing to operate upon, in short, since there were and are no subsequent precautionary measures taken there can be no evidence of the feasibility of taking such subsequent precautionary measures.

The court agrees with defendants' *reasoning* on this point, however it believes the inquiry does not end there, for two reasons. First, if Connaught had the capability of producing a safer vaccine in 1984 and for economic (as plaintiffs claim) or other reasons, did not choose to manufacture and market it in 1984, plaintiffs would, by application of defendants' logic, be foreclosed from ever discovering that fact.

Plaintiffs should be allowed to discover whether or not defendants could have produced a safer vaccine in 1984 and should not be required to take defendants' word for it. Second, the law of Alaska is contrary to defendants' assertion. In *Caterpillar Tractor Co. v. Beck, supra,* the Alaska Supreme Court, in considering the decision of the trial court, stated: (Pages 793–794)

The trial court's ruling is consistent with Alaska Rule of Evidence 407, which provides that in a products liability action evidence of subsequent measures is admissible for the feasibility of alternative designs as well as defective condition. (793)

Moreover, in negligence actions the focus is on the defendant's conduct at the time of the accident. Thus it can be said that conduct after the occurrence is irrelevant. In products liability actions, based on strict liability, however, the policy considerations which are involved shift the emphasis away from the manufacturer's conduct to the character of the product. Evidence about the character of the product as reflected in subsequent modifications or accidents, is highly probative in strict liability cases, and therefore is not excludable on relevancy grounds.

We therefore hold that evidence of post-injury accidents and design changes is admissible as authorized by the trial court. (794)

Also, on page 794, the Alaska Supreme Court quotes at length from the case of *Ault v. International Harvester Company,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1975) (once again following California not Oregon law) as to the rationale behind their conclusion that the exclusionary language in the latter part of Rule 407 should not be applied to products liability actions based on strict liability.

It is possible, of course, to quibble about the terms "subsequent modifications", "post-injury accidents", "design changes", "subsequent measures" or "subsequent improvements" and claim that no such activities have occurred with relation to the vaccine here involved. Connaught admits,

however, that its research is on-going and has been for years, even before 1984. Perhaps it is true that no progress has been made prior to or since 1984 which could be truly called an "improvement", "modification", "design change" or alteration of the character of the product. If so, plaintiffs should be allowed to examine the records and documents which show this to be the fact. More importantly, as stated above, plaintiffs should be allowed to discover whether or not defendants had the capability of producing a safer product during the period in question.

In view of the fact that under Alaska law evidence of subsequent measures or improvements is admissible to show the feasibility of alternative designs as well as defective condition and the further fact that plaintiffs' document request goes to the question of whether defendants were capable, prior to and after 1984, of producing a safer vaccine, defendants' arguments and the cases on which they rely (see pages 13 and 14 of defendants' brief) are inapposite.

The court agrees with defendants' arguments pertaining to discovery of information about the Biken vaccine to the extent that defendants should not be required to produce documents or records which will require them to violate their contract with Biken or to disclose information they do not possess. (See pages 15–17 and footnote 9 of defendants' brief (Dkt. #87)).

There can be no question, the court believes, that discovery of documents and records reflecting the nature and extent of defendants' research since 1984 bears less relevance to the subject matter of this case than does the research during and prior to 1984. It appears to the court, however, to be only a matter of degree, not a matter of kind, or type. If, indeed, as defendants admit, research is ongoing and has been since prior to 1984, it is probable that discovery of what has occurred since 1984 is empirically related to what was discovered and concluded before 1984.

Webster's Third International Dictionary (1981 Edition) defines "scientific method" as follows:

The principles and procedures used in the systematic pursuit of intersubjectively accessible knowledge and involving as necessary conditions the recognition and formulation of a problem, the collection of data through observation and, if possible, experiment, the formulation of hypotheses, and the testing and confirmation of the hypotheses formulated.

Of necessity, defendants' "ongoing research" must be based on the above, or a similar methodology, which enables defendants to learn from and build upon prior research results.

To the degree there is empirical linkage between pre–1984 research and post–1984 research, there is likewise a connective relevance which can hardly be doubted.

Given the broad definition of relevance for discovery purposes (see cases cited on page 9 hereof) the documents plaintiffs request are discoverable, absent some overriding and compelling interest that outweighs plaintiffs' need for such information (or the need to verify that some of the information does not exist, as defendants claim, or is not, perhaps, within defendants' possession, knowledge or control). The court agrees that defendants' interests in protecting trade secrets, producing a better product, and in protecting the results of research intended to give defendants a competitive economic advantage, are important ones. The court believes that those interests can be adequately protected, however, by proper court imposed controls, which will, at the same time, enable plaintiffs to play on a level field rather than go to trial blindfolded as to the facts bearing upon the essential issue of whether defendants were capable, in 1984 and prior thereto, of producing a safer DPT vaccine.

Accordingly, the court finds that plaintiffs' motion should be sustained and that in view of the controls hereafter delineated, by protective order and otherwise, the remaining arguments of defendants need not be addressed.

The court further finds that defendants should assemble, in their American Corporate offices, or such other place as counsel

may agree upon, all the documents and records within the scope of plaintiffs' Requests, for examination by plaintiffs' counsel (Messrs. Warshafsky and Hutton) *in place* and in the presence of defense counsel. Such examination and inspection shall be limited to plaintiffs' counsel reading the documents and records and designating, at that time, the writings which they desire to be reproduced. Plaintiffs' counsel shall not disclose to anyone, except each other, any information discovered during such in place inspection and shall not photograph or copy, in any form, or otherwise reproduce, any information contained in such documents or records, unless it be by consent of defendants' counsel, or pursuant to the protective order hereafter described, or the further order of the court.

True copies of those records and documents designated for reproduction by plaintiffs' counsel during the in place inspection shall be made by defendants (at plaintiffs' expense) from time to time during the inspection and delivered to plaintiffs' counsel. Mr. Warshafsky and Mr. Hutton may confer, in private, from time to time, during the inspection with the documents thus reproduced in their possession, in defendants' U.S. corporate offices.

All documents and records reproduced at the request of plaintiffs' counsel during such in place inspection, and all information learned from documents and records which are not reproduced during said inspection, shall be subject to a protective order prohibiting the further reproduction and/or dissemination of such records and information or the disclosure of any portion of the contents thereof, to any person other than counsel and those persons designated by name, address and telephone number in the protective order.

At the termination of the in place inspection, all the documents and records, designated during the inspection by plaintiffs' lawyers, shall be reproduced (if not already reproduced during the inspection) at plaintiffs' expense, and hand delivered to plaintiffs' counsel, or shipped at plaintiffs' expense in accordance with counsel's instructions, said documents and records remaining at all times subject to the protective order agreed to by counsel, or as hereafter drafted and/or altered by the court.

The court will not, at this time, attempt to draw the protective order, it being anticipated that counsel can agree to the same. The court suggests a protective order the same or similar to those utilized in the case of *Lacombe, et al. v. American Cyanamid Company, et al.* and *Rakers v. Lederle Laboratories,* referred to in the exhibits to plaintiffs' Memorandum Brief in support of the instant motion (Dkt. # 67). The court reserves the right to examine, change, or otherwise alter, the protective order agreed to by counsel.

The court further finds that defendants' Motion for Protective Order be sustained to the extent and within the limitations above delineated.

IT IS THEREFORE ORDERED that plaintiffs' Motion to Compel and defendants' Motion for Protective Order, as above limited and defined, be, and they hereby are, sustained.

IT IS, BY THE COURT, SO ORDERED.

