CHARLES J. KING, INC., Plaintiff,

v.

BARGE "LM–10", its appurtenances, etc., Luria Brothers Co., Inc., and Lipsett Steel Products, Inc., Defendants.

No. 79 Civ. 1333 (MEL).

United States District Court, S. D. New York.

July 22, 1981.

Dickerson, Reilly & Mullen, New York City, for plaintiff; Charles M. Tomaselli, New York City, of counsel.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for defendants Luria Brothers Co., Inc. and Lipsett Steel Products Inc.; George W. Clarke, New York City, of counsel.

LASKER, District Judge.

This suit arises out of the capsize of the barge LM–10 on August 4, 1978. Charles J. King, Inc. ("King") and Luria Brothers Co., Inc. ("Luria") are in the business of buying and selling scrap steel. Luria owns a fleet of barges used in transporting scrap steel products from outlying suppliers, such as King, to Luria's yard at Port Newark. Lipsett Steel Products, Inc. ("Lipsett") was affiliated with Luria and responsible for the maintenance and dispatch of Luria's barges at the time of the occurrences at issue.

On July 31, 1978, King and Luria entered into a contract whereby King agreed to sell Luria 4,000 tons of # 1 heavy melting steel scrap which Luria was to send its barges to pick up in installments. On August 2, 1978, Captain Harry Newak dispatched a Luria barge, the LM–10, to King's yard on New-town Creek in Brooklyn to receive the first load of steel scrap. On Thursday and Friday, August 2nd and 3rd, King's personnel loaded the barge. Upon completion on Friday afternoon James Moss, King's weighmaster, called Newak's office and left word that the barge was loaded and ready to be picked up. Except for a watchman employed for security, King's personnel did not work at the yard over the weekend.

On Sunday morning a passing tug captain, Myron Crowl, noticed that the LM–10 was listing toward the pier. Crowl was unable to contact Lipsett directly so he contacted the tug dispatcher for the New York Trap Rock Company who relayed the message to Lipsett. Lipsett sent a maintenance crew which had trouble getting to the barge because of traffic and stormy weather. When they finally reached the barge, they were too late to prevent the capsize, which they witnessed. The capsize resulted in damage to the LM–10 and to King's bulkhead and necessitated a salvage operation to recover the steel scrap.

King sues to recover for damages suffered by its bulkhead of $24,948. on the grounds that the LM–10 was unseaworthy and that Luria negligently failed to pick up the LM–10 before Sunday. Luria and Lipsett counterclaim for damages sustained in the amount of $24,124.06 on the grounds that King negligently loaded the barge and negligently failed to watch and sound the barge over the weekend. In addition, the defendants contend that King is liable for the damage caused by the capsize by virtue of the indemnity provision of Luria's confirmation of the purchase agreement. Luria also counterclaims for expenses incurred in salvaging the steel scrap the LM–10 had been carrying when it capsized.

## I.

We first consider defendants' claim that King was contractually bound to indemnify Luria for damages incurred in transporting the steel scrap.

The contract for the sale of the steel scrap was initiated by Jack King's telephone offer on behalf of King to Luria's trader, Sidney Schwartz, on July 31, 1978. Schwartz called King back later in the day and accepted King's offer, agreeing that Luria would buy 4,000 tons of # 1 steel scrap for $80. a ton, f.o.b. Kings' dock. (Tr. at 4). Luria sent a written confirmation form to King the next day. The confirmation consisted of a printed form which had a description of the steel, the quantity, the price, and the f.o.b. point typed on the front of the form. The back side of the printed form provided in part that

"1. *Contract* (a) This order constitutes the entire contract between the parties. Shipment of materials pursuant to this order shall be deemed to be an acceptance by the Seller of the terms and conditions of this order regardless of whether or not Seller has acknowledged this order.

2. *WARRANTY and INSURANCE*: All materials sold hereunder shall conform with the description set forth herein and shall be fit for the particular purpose or use for which the materials are required by the buyer or its customers. Seller shall procure and maintain product liability insurance. Seller shall indemnify Buyer against any and all actions, claims, damages, liabilities and expenses, including attorneys' fees, for any personal injury or property damage arising out of the transportation of such materials or the use thereof by buyer or its customers." (Pl.Ex. 1).

King did not sign the confirmation, nor did it voice any objection to its terms. According to Jack King, none of the quoted provisions were mentioned in his conversation with Schwartz. (Tr. at 7–8). Jack King also testified that the King company had been doing business with Luria for approximately seven years and regularly received identical confirmation forms. (Tr.

**1120**

at 9–11). Charles King, the President of King, testified that he may have signed the confirmation form on occasion. (Tr. at 48–49).

Defendants argue that Luria's written confirmation became the operative contract under N.Y.U.C.C. § 2–201(1) and (2) despite the fact that King had not signed it because King had reason to know its contents due to their prior course of dealing and did not object to the terms. Defendants contend that King was therefore bound under the warranty and insurance provision quoted above to indemnify Luria against any loss incurred in transporting the steel scrap.

■ Defendants' contention is unpersuasive for several reasons. First, defendants' interpretation of the warranty and insurance paragraph to encompass damage incurred by virtue of the capsize of its barge is unduly broad. While the indemnity provision is somewhat ambiguous, the context of the entire paragraph suggests that it was concerned with the warranty of the goods themselves rather than with loss incurred in the transportation of the goods not due to defects of the goods. Thus, assuming *arguendo* that Luria's confirmation constituted the operative contract, the provision can-not be reasonably construed on its face to provide for King to indemnify Luria for the type of loss at issue.

■ Second, defendants' reliance on N.Y. U.C.C. § 2–201(1) and (2) (the U.C.C. Statute of Fraud) is misplaced.[1] King's uncontradicted testimony and the typed provisions on the face of the confirmation demonstrate that the parties agreed that Luria would take the goods f.o.b. at King's dock. If, as Luria contends, its confirmation provided that King would indemnify Luria for any damage incurred after the goods were loaded at King's dock, its confirmation materially altered the terms of the oral agreement. This new term is governed by N.Y. U.C.C. § 2–207(2)(b) which provides that additional terms contained in a confirmation do not become part of the contract if they materially alter the contract.[2] *See* N.Y.U.C.C. § 2–207, Official Comment, n. 5. Section 2–201, upon which defendants rely, does not apply to the facts of this case. While that section does relate to a written confirmation of an oral contract, it provides only that a merchant receiving a written confirmation with knowledge of its contents who fails to object may not interpose a

---

1. Section 2–201(1) and (2) provide:
"(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.
(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received."

2. Section 2–207 provides:
"§ 2–207. ADDITIONAL TERMS IN ACCEPTANCE OR CONFIRMATION
(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
(a) The offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act."

statute of limitations defense in an action to enforce the contract. The case at bar does not involve a statute of limitations defense and, in any event, § 2–201 does not purport to govern where the written confirmation materially differs from the oral agreement. *See* N.Y.U.C.C. § 2–201, Official Comment, 3.

■ Third, while a prior course of dealing between parties under identical terms can establish assent to contractual terms despite one party's failure to sign the written contract, *see Ernest J. Michel & Co. v. Anabasis Trade, Inc.*, 72 A.D.2d 715, 422 N.Y.S.2d 79 (1st Dept. 1979), defendants here presented no evidence that the prior transactions between Luria and King were identical. Specifically, it is clear that in this transaction the parties agreed that the f.o.b. point was to be at King's dock. Thus, regardless of what King may have agreed to in the past, the express terms of this contract establish that King did not agree to indemnify Luria for any loss incurred in transporting the goods from King's dock to Luria's yard in this sale.

## II.

■ Defendants next contend that King is liable for damage to the LM–10 because King caused the capsize by its negligent loading of the barge. King answers that the capsize was caused by the pre-existing unseaworthiness of the LM–10.

The defendants maintain that King overloaded the LM–10 and improperly peaked the load. According to the testimony of Frank Wasinski, Lipsett's barge foreman, when he and his crew arrived at the King yard the day of the capsize, they found the LM–10 floating in a listing condition and heavily loaded, with its load improperly peaked. (Tr. at 134–37, 139, Defs. Exs. V, W, X). Defendants support their theory of the capsize with evidence that approximately 1250 tons of new # 1 steel was salvaged from Newtown Creek after the capsize. (Tr. at 184–88). The normal load for the LM–10 is approximately 1000 tons, (Tr. at 52, 277, 317), and, according to the testimony of Peter B. Kelman, the surveyor for the

defendants, a load of 1250 tons would be sufficient to topple the barge. (Tr. at 277).

King disputes defendants' contention that improper loading caused the capsize. Charles King and Bernard Schaffel testified that only approximately one thousand tons of new steel were salvaged. (Tr. at 27, 44–45). Moreover, King maintains that overloading would have caused an immediate list which would have been apparent on Friday afternoon when the loading was complete. Each of King's witnesses to the completion of the loading testified that the LM–10 was not listing when they left on Friday afternoon. (Tr. at 19, 36–37, 76–79). In addition, Schaffel testified that he measured the freeboard upon completion of loading at 18 inches and the height of the stow at 10 to 12 inches about the endrails, (Tr. at 20–21), measurements which indicate a load of approximately 1000 tons. (Tr. at 35–36, 50–52, 61, 277–280). According to King's crane operator, Harold Lingard, he loaded the cargo so that the steel was flat, rather than peaked, across the top of the stow. (Tr. at 74).

King contends that the capsize of the LM–10 was due to its unseaworthiness. The unexplained capsize, according to King, raises a presumption that the vessel was unseaworthy, *see Peterson Lighterage and Towing Corporation v. Belgian Line*, 154 F.Supp. 461, 463 (S.D.N.Y.1957), *aff'd* 253 F.2d 952 (2d Cir. 1958), which defendants have not rebutted. Moreover, King argues that the fact that the LM–10 floated for two days before capsizing suggests that it was taking on water. King emphasizes the many repairs which had been done on the LM–10 immediately prior to this voyage, the long repair record of the LM–10, and the fact that the LM–10 had only been used to cover purchase contracts from outside yards once in the preceding two years.

According to King, water leaked into the LM–10's stowing compartments from holes along the starboard chine, listing the vessel toward the pier until it finally toppled. This scenario is supported by the testimony of Peter Roche, who surveyed the LM–10 for King while it was in drydock. Roche

testified that the internal compartments of the LM–10 were severely corroded and that there were several wasted holes and a puncture along the starboard chine which, including a puncture, totalled an accumulated opening of approximately 56 linear inches by ⅜ inches. (Tr. at 226–27, Pl.Ex. 7). Roche opined that the holes preexisted the capsize and that the LM–10 probably capsized due to water taken in through the starboard chine which created a free surface effect which, when amplified by the swells from passing traffic, rocked the barge and resulted in the capsize. (Tr. at 230, Pl.Ex. 7). King presented several photographs taken at the time of the survey which show water leaking out of holes on the starboard chine. (Pl.Exs. 8 (8, 9, 11, 12, 14), 9 (1–5)). King contends that Roche's findings are further supported by the report of defendants' surveyor Nolan which refers to bottom and side indentations, holes, cracked welds on patches and doublers, and distortions. (Defs.Ex. RR, app. 3).

Defendants dispute King's theory that the LM–10 was unseaworthy at the time it was sent to the King yard. According to the testimony of Frank Wasinski, the barge foreman for Lipsett, the LM–10 was opened up, repaired and thoroughly inspected by himself and his crew prior to being dispatched to the King yard. They found the LM–10 watertight and fit for service. (Tr. at 123–125). Wasinski also testified that when the LM–10 capsized it rose high in the water and then bounced, indicating its continued buoyancy. (Tr. at 146). The morning after the capsize Wasinski and Peter Gallagher, a surveyor, walked the bottom of the LM–10 and found only one crack seeping air about an inch long. In Wasinski's opinion, this crack was too small to sink the barge and had not existed at the time of his August 2nd inspection of the barge. (Tr. at 155). In addition, he and Gallagher found wasted areas on the outer plate along the starboard chine of the barge but Gallagher, by poking a rod through the holes and meeting an obstruction, determined that no air was escaping through these holes. (Tr. at 156, 214–15). Wasinski testified that

these wasted areas had been repaired in 1976 by the installation of inner plates which were welded to form a new interior corner. (Tr. at 158). According to Wasinski, his August 2nd inspection revealed that these repairs remained watertight when the LM–10 was sent to King's yard.

The defendants explain the numerous defects discovered during the survey of the barge as being caused by the capsize itself or by the salvage. Defendants dispute Roche's conclusion that the starboard chine holes caused the capsize, arguing that Roche admitted on cross-examination that the size of the holes which he found would have admitted several thousand gallons of water a minute, or enough water to fill a compartment in ten hours. The fact that the LM–10 floated at King's yard for two days without serious listing, defendants argue, thus contradicts Roche's conclusion that leakage through the holes caused the capsize. Furthermore, defendants argue that Roche's opinion that a swell from passing traffic may have caused the capsize once the barge had taken on water is contradicted by the testimony of Myron Crowl, the tug captain who first noticed the LM–10 listing, that traffic moves through Newtown Creek slowly and does not cause heavy swells. (Tr. at 94.) Finally, defendants claim that the water which Roche found (and photographed) leaking from the starboard chine holes was merely the water trapped between the wasted exterior plate and the inner plate which had been installed in 1976. (Tr. at 159, 207). The inner plate, or "doubler," contained no holes, according to Kelman. (Tr. at 268).

### III.

While the question is close, we find that the capsize was caused by the unseaworthy condition of the barge. The photographs and survey reports amply demonstrate that the LM–10 suffered from numerous wasted areas, indentations, cracked welds on patches and doublers, holes and distortions. While some of these defects may have been caused by the capsize itself or the loading, as defendants contend, Roche's testimony

that the holes on the starboard chine pre-existed the capsize is uncontradicted. Defendants' argument that the interior doublers served to seal the barge despite this exterior waste is contradicted by the survey report of B. F. Nolan, contained in defendants' own exhibit, which found that the doublers on the starboard side of the barge themselves contained "numerous cracked welds." (Defs.Ex. RR, App. 3, p.3). It is thus likely that the capsize was caused by leakage through the outside holes and in turn through the cracks in the interior doublers. This conclusion is consistent with the fact that the LM–10 did not begin listing for two days after it was loaded. While defendants persuasively demonstrated that Roche's hypothesis that water leaked directly from the starboard chine holes into the barge's containers is implausible because such leakage would fill a compartment within ten hours, (Tr. at 252–53), it is a reasonable inference that leakage would occur much more slowly if the water also had to work itself through the cracks in the inside doublers.

This conclusion is also supported by the evidence that water was leaking from the starboard chine holes when Roche inspected the barge on August 17th. Defendants argue that this leakage was merely the water which was trapped between the exterior plate and the interior plate, not leakage from the interior of the vessel. However, the space between the starboard chine and the doubler was at most one and one-half inches and the LM–10 had been in drydock at least since the preceding day. (Tr. at 159, 267). As defendants' cross-examination of Roche established, the size of the holes on the starboard chine would have allowed in enough water to fill an entire compartment within ten hours. Common sense suggests that, by the same token, water would flow *out* of the barge once it was dry-docked at roughly the same rate. Given that the barge had been dry-docked at least since the previous day, any water trapped within the small cavity between the starboard chine and the doubler should have drained by the time of Roche's inspection. Therefore, it is reasonable to conclude that the cause of the continued flow of water on August 17th was that the water was draining from the barge's compartment, through the "numerous cracked welds" in the doublers.

Moreover, King has established that the LM–10 was not overloaded. The testimony of King's witnesses that the LM–10 was loaded to an 18 inch freeboard credible. Defendants have altogether failed to rebut King's argument that if the barge had been overloaded, it would have immediately begun to list. Having heard King's witnesses, we do not believe that they would have irresponsibly left the LM–10 in a listing condition after loading. Moreover, defendants do not contest that an 18 inch freeboard was reasonable for the LM–10; in fact, Kelman testified that such a freeboard would cause no problem in New York harbor. (Tr. at 280).

We do not find defendants' evidence concerning the load on the LM–10 persuasive. Wasinski's view of the barge on the night of the capsize could not have been very complete. The dock was unlighted (Tr. at 191), and, because of the heavy rain, he and his men waited in their trucks for a considerable time. When the rain stopped, they left their trucks and, as they approached the barge, it capsized, leaving little opportunity to examine it. (Tr. at 144–45). The testimony that 1250 tons of new steel were salvaged from Newtown Creek is not free from doubt, for defendants concede that much of the salvage produced old steel which was not part of the LM–10 cargo. Given the inherent difficulty in separating the old and new steel with a magnet operated from a floating crane (Tr. at 185–87), it is not easy to believe that the portion of new steel could have been effectively quantified during the salvage. It follows that the figure of 1250 tons must be treated as an optimistic estimate on the part of defendants.

### IV.

■ Defendants' contention that King had a duty to keep watch over the LM–10

over the weekend is without merit. King's evidence established that Newak's office was notified that the LM–10 was ready to be picked up on Friday afternoon. At that point, the defendants were on notice that they were free to pick up the barge and thus King's possession of the property was not exclusive, making a presumption of negligence on the part of the bailee inappropriate. *See United States v. Mowbray's Floating Equipment Exchange,* 601 F.2d 645, 647 (2d Cir. 1979). Moreover, there was no general obligation on the part of King to "mind" the vessel at its wharf. *Daly v. Reading,* 220 F.2d 534, 536 (2d Cir. 1955). King was only obligated to render reasonable assistance if needed. *Daly* at 536.

## V.

■ Defendants' remaining contentions are without merit. Defendants claim that King failed to mitigate its loss rests on the proposition that King was *per se* obligated to obtain more than two bids for the repair of its dock. We disagree. King's action in taking two bids for the repair and choosing the lower bid appears reasonable in the circumstances and defendants have presented no basis to conclude otherwise. Defendants' belated claim that it is entitled to a limitation of liability under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 183, is misplaced because defendants have not established that the unseaworthiness of the LM–10 was without their "privity or knowledge." *See Petition of Long,* 439 F.2d 109 (2d Cir. 1971); *McNeil v. Lehigh Valley Railway Co.,* 387 F.2d 623 (2d Cir. 1967), *cert. denied,* 390 U.S. 1040, 88 S.Ct. 1638, 20 L.Ed.2d 302 (1968).

\* \* \* \* \* \*

This Memorandum constitutes the court's findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure. King is entitled to recover for the damage to its bulkhead and any other expenses it incurred as a result of the capsize of the LM–10.

Submit judgment on notice.