PALMER G. LEWIS COMPANY, INC.;
and Premier Industries, Inc. d/b/a West-
ern Insulfoam Manufacturing Company,
Appellants/Cross–Appellees,

v.

ARCO CHEMICAL COMPANY,
Appellee/Cross–Appellant.

Nos. S–6034, S–6084.

Supreme Court of Alaska.

Oct. 20, 1995.

Thomas A. Matthews, Matthews & Zahare, Anchorage, for Appellants/Cross–Appellees.

Sanford M. Gibbs, Stone, Waller, Jenicek, Brown & Gibbs, Anchorage, and Larry Espel, Greene Espel, Minneapolis, Minnesota, for Appellee/Cross–Appellant.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION

The principal issue in this appeal is whether a manufacturer which settles a products liability lawsuit is entitled to implied indemnity (i.e., common law indemnity) from one of its raw materials suppliers. This appeal also raises the question of whether, and under what circumstances, an express indemnification provision can serve to shield a raw material supplier from a manufacturer's claim for implied indemnity.

### II. FACTS AND PROCEEDINGS

In 1987 the Wainwright/Alak School complex was destroyed when children lit a fire under the raised building, igniting exposed polystyrene insulation which had been installed on the underside of the school structure. Eventually, the insurers for the North Slope Borough and North Slope Borough School District [the borough and the district are hereinafter referred to as "NSB"] paid approximately $14 million for the loss, and NSB filed a subrogation action against Western Insulfoam Manufacturing Company ("Western"), the manufacturer of the insulation,[1] and Palmer G. Lewis Company ("Lewis"), the retailer, as well as eleven other parties involved in the construction of the school. NSB asserted claims against Western for the fire loss based on strict liability, negligence, and breach of warranty for selling an allegedly defective and unreasonably dangerous product which was not fit for its intended use. As to Lewis, NSB's sole claim was that it was strictly liable for selling a defective and unreasonably dangerous product.

In tracing the chain of distribution, the record shows that Western formed the insulation, trade named "Insulfoam," by expanding and molding polystyrene beads which were supplied to it by ARCO.[2] Western then sold the insulation, in final product form, to Lewis, which in turn resold it to contractors, who used it to insulate the underside of the school.

After ARCO rejected their tender of defense, Western and Lewis filed a third-party complaint against ARCO based on implied indemnity.[3] In its answer, ARCO denied any

1. Western is a division of Premier Industries, Inc.

2. ARCO was not the sole supplier of insulation beads to Western. In fact, during the relevant period, another company, BASF, supplied approximately four times as many beads as ARCO. However, Western's experts concluded that ARCO was the "probable source" of the beads used in the insulation that was installed at the Wainwright/Alak School. ARCO contested the issue of causation below and raises it again on cross-appeal.

3. Specifically, in their complaint, Western and Lewis claimed:
 [S]hould Defendants and Third–Party Plaintiffs be found liable to the Plaintiffs ... for fire damage to the school and its contents, Defendants and Third–Party Plaintiffs are entitled to indemnification from ... ARCO ... as manufacturer[] of the polystyrene beads from which Insulfoam is formed and head[] of the product distribution chain.
 Additionally, because of [its] status as the initial manufacturer of polystyrene beads and head of the product distribution chain of an allegedly defective product, ARCO ... [is] required to reimburse Defendants and Third–Party Plaintiffs for ... full indemnification for any reasonable settlement figure that Defendants and Third–Party Plaintiffs may have to pay to protect themselves in this litigation.

duty to indemnify Western and Lewis, and alleged numerous affirmative defenses.

In June 1992, Western and Lewis settled the underlying subrogation action with NSB for $3.2 million. The comprehensive agreement released Western from "any and all" claims—warranty, negligence, and strict liability—and likewise, Lewis from any derivative strict liability claims. Shortly thereafter, Western, Lewis and ARCO filed cross-motions for summary judgment in the indemnity action.

The superior court denied Western and Lewis' motion for summary judgment, holding that as third-party plaintiffs, Western and Lewis must prove that ARCO's beads were defective. The superior court simultaneously granted ARCO's motion for summary judgment, holding that an express indemnification provision between ARCO and Western was applicable, thus shielding ARCO from any implied indemnity claims that Western or Lewis could otherwise assert against it. The superior court also awarded full attorney's fees to ARCO against Western. Western and Lewis now appeal the superior court's summary judgment orders, and ARCO cross-appeals claiming that its summary judgment motion, though properly granted, should have been granted on additional grounds as well.

## III. DISCUSSION

A. *The Superior Court Did Not Err in Denying Western's Motion for Summary Judgment Against ARCO.*[4]

1. *The Superior Court held that Western failed to prove that ARCO's beads were defective.*

 Western argues that ARCO is automatically liable as an indemnitor since Western settled the underlying subrogation claim in good faith and since it had previously tendered timely defense of this claim to ARCO.[5] In essence, Western asserts that based on our holding in *Heritage v. Pioneer Brokerage and Sales, Inc.*, 604 P.2d 1059 (Alaska 1984), its settlement conclusively establishes ARCO's status as an implied indemnitor under the doctrine of strict liability. ARCO counters that Western must prove, among other things, that ARCO's beads were defective before it is deemed an indemnitor under products liability law. Western responds that requiring it to prove that the beads were defective creates a perverse incentive for it, and other manufacturers like it, to forego settlement of the underlying claim, lose the case at trial, and then bind ARCO as an indemnitor. Finally, Western contends that this court's decisions in this area are "inconsistent" and "conflicting" and "have led to much confusion."[6]

Western's apparent confusion probably stems from a failure to appreciate the distinction between a manufacturer and a retailer. In considering the parties' motions, the superior court accurately summarized Alaska law:

> The general rule of implied indemnity in Alaska is that an innocent supplier of a defective product who is liable on a theory of strict liability is entitled to indemnity from the manufacturer of the defective product. *Ross Laboratories v. Thies*, 725 P.2d 1076, 1081 (Alaska 1986); *D.G. Shelter Products Co. v. Moduline Industries, Inc.*, 684 P.2d 839, 841 (Alaska 1984). Even if no liability is found, the innocent supplier may nonetheless be entitled to indemnity from the manufacturer for the attorney's fees and costs in defending the action. *Heritage v. Pioneer Brokerage*

---

4. In reviewing the appropriateness of summary judgment, this court reviews the evidence and draws all reasonable inferences of fact in the light most favorable to the non-moving party. *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992). Summary judgment will be upheld when the evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Saddler v. Alaska Marine Lines, Inc.*, 856 P.2d 784, 787 (Alaska 1993); *see also* Alaska R.Civ.P. 56(c).

5. Since Lewis was fully indemnified by Western, Western is the real party in interest. Neither Western nor Lewis claims otherwise in this appeal. Consequently, for purposes of discussion, Western is the sole third-party plaintiff.

6. Western claims that *Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059 (Alaska 1979), and *DG Shelter Prods. Co. v. Moduline Indus., Inc.*, 684 P.2d 839 (Alaska 1984), are inconsistent.

*and Sales, Inc.*, 604 P.2d 1059 (Alaska 1979). A supplier entitled to indemnity may be a retailer, a lessor, or even a manufacturer who incorporates an already defective component part into its product. *See Ross Laboratories*, 725 P.2d at 1081 (retailer); *Koehring Mfg. Co. v. Earthmovers of Fairbanks, Inc.*, 763 P.2d 499 (Alaska 1988) (lessor); *D.G. Shelter Products*, 684 P.2d at 840 (manufacturer). A party who is independently negligent is completely barred from recovery under the theory of implied indemnity. *Koehring Mfg.*, 763 P.2d at 504; *Ross Laboratories*, 725 P.2d at 1081; *Vertecs Corp. v. Reichhold Chems., Inc.*, 661 P.2d 619, 626 (Alaska 1983).

■ *Heritage* stands for the following proposition: A party is entitled to indemnity for its attorney's fees and costs when it successfully defends an action if it would have been entitled to indemnity had it lost the case after trial. *See Heritage*, 604 P.2d at 1067. In footnote 27 of *Heritage* we acknowledge another application of this same principle: A party is entitled to indemnity when it settles a case if it would have been entitled to indemnity had it tried the case and lost. *See id.* While focusing on footnote 27, Western apparently neglected footnote 25 of *Heritage* which states that only the issue of attorney's fees was before us on appeal. *Id.* That is, for purposes of appeal, the underlying issue of the manufacturer's indemnity liability had already been established, a situation quite distinct from the case at bar.[7]

■ In this instance, if, instead of settling, Western had tried the case and lost, it would not have automatically been entitled to indemnity from ARCO. Instead, it would have had to prove that the beads ARCO supplied were defective, and also would have had to prove causation, before it was entitled to indemnity.

In applying *Heritage*, Western argues that its good faith settlement with NSB should not preclude it from seeking indemnity. Western is correct: its settlement does not preclude it from seeking indemnity. However, its settlement alone does not guarantee that it is entitled to indemnification.

Western additionally argues that ARCO's beads were defective and that it merely expanded and shaped the beads into insulation. In essence, Western's argument is predicated on its assertion that ARCO was the manufacturer of a defective product and Western merely resold ARCO's product—polystyrene beads—much like an intermediary does through the ordinary chain of distribution. Though in some instances the demarcation between a "manufacturer" and a "retailer" will undoubtedly be difficult to discern, this case does not present such an instance. Western, through a relatively complex procedure, processed, steamed, and molded the beads supplied by ARCO into ready-cut pieces of insulation.[8] Consequently, Western is not automatically entitled to indemnity from ARCO. However, it is not automatically precluded either. In short, it must prove that ARCO's beads were defective.[9] *See D.G. Shelter Prods.*, 684 P.2d at 841.

7. Similarly, in *Vertecs Corp. v. Reichhold Chems., Inc.*, 661 P.2d 619 (Alaska 1983), we stated:
 In *Heritage*, the duty to indemnify was given; the question was whether that included a duty to defend.... In the present case, the question is whether a duty to indemnify exists at all. Merely because *Heritage* states that contractual and implied indemnity should be treated the same once a duty to indemnify exists does not mean that language from a contractual indemnity case may be bootstrapped into *providing a duty to indemnify* in a noncontractual situation.
 *Id.* at 623 n. 8 (emphasis in original).

8. Western's 1975 annual report states:
 Insulfoam EPS is manufactured in a two-stage process from expanded polystyrene beads. In the first stage, these small spheres are subject-

ed to high temperature steam, causing the incorporated blowing agent to volatilize and the individual beads to expand. The "pre-puff" is allowed to stabilize and then fed into a large closed mold. Steam is reintroduced and the heat produces a secondary expansion that fuses the beads into a homogeneous block of expanded polystyrene. The standard block is molded in width 2' to 4' and length 8' to 24' with any thickness available up to 33".

9. As for Western's claim that such a holding creates perverse incentives, its fears are unjustified. Foregoing settlement and intentionally losing its underlying case would not necessarily bind ARCO as an indemnitor. Instead, Western would have to prove that ARCO's beads were defective, as well as defeat ARCO's numerous affirmative defenses, to receive indemnity.

## 2. ARCO Raised the Issue of Western's Independent Negligence.

The superior court alternatively held that even if Western had proved that ARCO's beads were defective, summary judgment in favor of Western was still inappropriate since "ARCO ha[d] sufficiently raised the issue of Western['s] ... [independent] negligence." It is well established that negligence is a complete bar to indemnification. *Koehring*, 763 P.2d at 503–04; *see also Ross Labs.*, 725 P.2d at 1081. Pursuant to Alaska Rule of Civil Procedure 8(c), ARCO affirmatively pled the issue of Western's negligence and presented evidence in support of its defense.[10] As the superior court correctly concluded, ARCO "has produced evidence of negligence sufficient to overcome Western['s] ... motion." At trial, ARCO bears the burden of proving Western's negligence.[11]

### B. The Superior Court Erred in Granting ARCO's Motion for Summary Judgment Against Western.

### 1. Background.

The superior court granted ARCO's motion for summary judgment against Western on one basis: it held that an express indemnity provision between the parties barred Western's claim for implied indemnity. The indemnity provision was contained on the reverse side of purchase order confirmations routinely sent by ARCO to Western after Western had placed an order, but before the beads were sent. The indemnity provision states:

18. INDEMNIFICATION—Buyer [Western] agrees to defend, indemnify and save harmless Seller [ARCO] from any and all claims of whatsoever nature including but not limited to injuries to Buyer's or Seller's employees or to third parties (including death), or for damages to the prop-

erty of Seller, or to the property of Buyer, or of third parties, caused by, arising directly or indirectly from, or occurring in a) any handling of said materials, including but not limited to, unloading railroad cars, tank cars, trucks, tank trucks, barges, or in handling containers of materials sold, and b) any use of said materials.

Also of significance is the front side of each purchase order confirmation form. In addition to containing price and quantity information, it contains a proviso in small print at the bottom of the page which reads:

ATTENTION: "This order is accepted by us subject to the Terms and Conditions printed on the REVERSE SIDE OF THIS SHEET and your acceptance of delivery of the material set forth above constitutes acceptance of these Terms and Conditions. THE WARRANTY SET FORTH ON THE REVERSE HEREOF IS EXPRESSLY IN LIEU OF ANY OTHER EXPRESS OR IMPLIED WARRANTIES INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PURPOSE AND ANY OTHER OBLIGATION ON THE PART OF SELLER."

After determining that Washington law governed interpretation of the transaction, the superior court concluded that the express indemnity provision shielded ARCO from Western's implied indemnity claim. Western claims on appeal that the hold harmless indemnification provision was a material alteration of the parties' agreement and thus is not a term of the contract under the UCC. Though Western did not raise this issue below, we nonetheless consider it since, for reasons discussed below, it "involves a question of law that is critical to a proper and just decision." *Vest v. First Nat'l Bank of Fairbanks*, 659 P.2d 1233, 1234 n. 2 (Alaska), *aff'd on reh'g*, 670 P.2d 707 (Alaska 1983). Addi-

---

10. ARCO's evidence, when viewed in the light most favorable to it, indicates that Western may have been negligent in the marketing, labeling, and coating of its end product.

11. In considering Western's motion for summary judgment, the superior court stated that Western "must still show that ARCO supplied a defective product *and that Western ... was not negligent.*" (Emphasis added.) Western correctly notes that

the superior court erred when it saddled Western with the burden of proving an absence of negligence on its part. As an affirmative defense, the burden rests with ARCO. *Koehring*, 763 P.2d at 504, 508. However, this does not alter the fact that ARCO sufficiently raised the issue of Western's negligence so as to defeat Western's motion for summary judgment.

tionally, there is a strong argument that the superior court's failure to consider the UCC issue constitutes plain error. *See Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 115 (Alaska 1990).[12]

### 2. *Choice of Law: Washington or Alaska?*

■ Before determining the legal effect of the express indemnity provision at issue here, it is necessary to resolve a choice of law question. In summarizing the arguments below, the superior court stated:

> The parties dispute whether Washington law or Alaska law governs the validity of the express indemnity clause. Western ... argues that Washington law applies because that is the place of negotiating, contracting, and performance of the sales contract containing the disputed clause. ARCO argues that the issue is whether Western ... is entitled to implied indemnity under Alaska's common law, which would be analyzed under Alaska law.

When choice of law issues arise, we commonly refer to the *Restatement (Second) of Conflicts* for guidance.[13] In this instance, application of *Restatement* principles leads to the conclusion that Washington law controls.[14] As the *Restatement* directs, since ARCO's purchase order confirmation form does not contain a choice of law provision, section 188 of the *Restatement* governs. It instructs that we look to the place of contracting, negotiation, and performance of the contract, all of which took place in Washington. Consequently, Washington law governs disposition of this issue.

### 3. *UCC Analysis: Was the Indemnification Clause Contained in ARCO's Purchase Order Confirmation Form Incorporated into the Parties' Agreement Under UCC Section 2-207?*

Western claims, pursuant to section 2-207 of the Uniform Commercial Code (UCC), that the indemnity provision constituted a "material alteration" of the parties' agreement and as such did not become a term of the parties' contract. Section 2-207 of the UCC, as codified in Alaska at AS 45.02.207 and Washington at Wash.Rev.Code § 62A.2-207 (1994), states:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the

---

12. To obtain summary judgment, ARCO must show the absence of genuine issues of material fact and that it is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c). Thus, if ARCO did not show that Western expressly agreed to the indemnification clause, discussed *infra*, § III(B)(4), it must demonstrate some legal basis why the clause became part of the parties' contract. Section 2-207 of the UCC, as discussed *infra*, is the only legal means by which an additional clause contained in an acceptance or written confirmation not previously expressly agreed to by the parties can be incorporated.

13. *See, e.g., Ehredt v. DeHavilland Aircraft Co. of Canada, Ltd.*, 705 P.2d 446, 453 (Alaska 1985); *Hinchee v. Security Nat'l Bank*, 624 P.2d 821, 822 n. 1 (Alaska 1981).

14. *Restatement (Second) Conflict of Laws* § 173, cmt. b (1988), states, "The existence of a contractual right to indemnity, and the rights created thereby, are determined by the law selected by application of the rules of §§ 187–188."

Accordingly, § 188 states:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties....

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account ... to determine the law applicable to an issue include:
(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.
(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied....

contract. Between merchants such terms become part of the contract unless:

> (a) the offer expressly limits acceptance to the terms of the offer;
>
> (b) they materially alter it; or
>
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

 We must first determine whether the small proviso contained on the front side of ARCO's confirmation form converts an otherwise valid acceptance into a *de facto* rejection and counteroffer.[15] That is, if ARCO's purchase order confirmation form operates as an acceptance, then the indemnification clause becomes incorporated only if it is not a "material alteration" of the parties' contract under section 2–207(2)(b); if it operates as a counteroffer, however, the relevant question becomes whether Western accepted ARCO's counteroffer, and thus the accompanying indemnification clause, when it accepted delivery of the beads.

As previously observed, this issue must be analyzed under Washington law. In *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.,*

28 Wash.App. 539, 625 P.2d 171 (1981), the court, without specifying what type of language constitutes a counteroffer, addressed a situation similar to the one now posed. In *Hartwig Farms,* the seller argued that the buyer was bound by a warranty disclaimer clause contained on an invoice delivered with the goods. The court held that because the warranty disclaimer clause was a "material alteration," a buyer does not assent to it by merely accepting delivery of the goods. The court stated:

> In *Roto–Lith, Ltd. v. F.P. Bartlett & Co.,* 297 F.2d 497 (1st Cir.1962), the court held the disclaimer on a sales acknowledgement to be a material alteration and an acceptance conditional on the offeror's assent to the additional term. The *Roto–Lith* court also held a buyer, when he accepted goods, became bound by the additional terms set by the seller. This result has not been followed by all courts and we decline to follow it here.

*Id.* at 174.[16]

Thus, the court rendered moot any distinction between a counteroffer and an acceptance. That is, the court effectively held that when a buyer accepts delivery of goods, it does not assent to a warranty disclaimer clause, or any other clause which materially alters the contract, even if the invoice containing the clause is characterized as a counteroffer. In such cases, the only relevant question is whether the contested clause materially alters the contract under section 2–207(2)(b).

---

**15.** *See generally* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1–3, at 40–42 (3d ed. 1988 & Supp.1990) [hereinafter *White & Summers* ] (stating that in determining whether a contested clause is incorporated into the parties' agreement under section 2–207 of the UCC, a court must first determine whether the invoice or confirmation containing the clause operates as an acceptance or counteroffer; this threshold characterization—acceptance vs. counteroffer—often controls whether a contested term is incorporated).

**16.** In *Roto–Lith* the court held that a confirmation form such as ARCO's operates as a counteroffer, and a buyer's subsequent receipt of goods operates as an acceptance of the counteroffer, including any contested terms. *Roto–Lith,* 297

F.2d at 500. Except in the First Circuit—where *Roto–Lith* liberally construes counteroffers—confirmations such as ARCO's are routinely held to operate as acceptances, rather than counteroffers, and contested clauses thus incorporated only if immaterial under section 2–207(2)(b). For example, in *Dorton v. Collins & Aikman Corp.,* 453 F.2d 1161 (6th Cir.1972), the court held that a provision which stated, "The acceptance of your order is subject to all the terms and conditions on the face and reverse side hereof," was not expressly conditional and thus operated as an acceptance rather than a counteroffer. Significantly, the *Dorton* proviso is almost identical to ARCO's. *See generally White & Summers* at 41–42.

Yet ARCO argues that *Hartwig Farms* is distinguishable since it involved a warranty disclaimer clause contained on an invoice sent with the shipment of goods, whereas the instant case concerns an indemnification clause contained on a confirmation sent some time before the shipment of goods. However, we note that in *Rottinghaus v. Howell*, 35 Wash.App. 99, 666 P.2d 899, *review denied*, 100 Wash.2d 1016 (Wash.1983), the same court subsequently held that any distinction between an invoice and a confirmation is irrelevant. The court stated, "[T]he fact that the limitations appeared on written confirmations signed by the parties rather than an invoice as in *Hartwig* or a label attached to the container as in *Dobias [v. Western Farmer's Ass'n*, 491 P.2d 1346 (Wash.App.1971) ] is irrelevant[.]" *Rottinghaus*, 666 P.2d at 905. Consequently, under Washington law, the express indemnity clause contained on ARCO's purchase order confirmation form is enforceable only if it does not constitute a material alteration of the parties' contract.[17]

Generally, materiality is a question of fact.[18] Comments four and five to section 2–207 provide that the test for materiality is whether the newly introduced clause would result in surprise or hardship to the non-assenting party.[19] In Washington, the burden of showing surprise is placed on the party against whom the term would operate.[20] However, courts have held that certain clauses are material as a matter of law.

For instance, in Washington and elsewhere, clauses such as those listed in Code comment four, like warranty disclaimers, are routinely deemed material as a matter of law.[21] Similarly, though Washington

**17.** Neither party disputes its status as a "merchant."

**18.** Though neither Washington courts nor this court have defined "materiality" in the context of section 2–207(2)(b), other courts have. *See Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1203 n. 8 (7th Cir.1991) (" 'material alteration' is a question of fact to be resolved by the circumstances of each particular case"); *Trans–Aire Int'l, Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1261 (7th Cir.1989) ("Generally, whether an additional term 'materially alters' a contract should not be determined upon a summary judgment motion because the inquiry is merely part of a process to ascertain parties' bargaining intent."); *Hatzlachh Supply Inc. v. Moishe's Elecs., Inc.*, 828 F.Supp. 178, 183 (S.D.N.Y.1993) ("modern day approach favors a case-by-case materiality determination"), *order vacated on other grounds*, 848 F.Supp. 25 (S.D.N.Y.1994), *aff'd*, 50 F.3d 4 (2d Cir.1995).

**19.** Comment four provides examples of terms that are material:

Examples of typical clauses which would normally "materially alter" the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: a clause negating such standard warranties as that of merchantability of fitness for a particular purpose in circumstances in which either warranty normally attaches; a clause requiring a guaranty of 90% or 100% of deliveries in a case such as a contract by a cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

Comment five provides examples of terms that are not material:

Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control, similar to those covered by the provision of this Article on merchant's excuse by failure of presupposed conditions or a clause fixing in advance any reasonable formula of proration under such circumstances; a clause fixing a reasonable time for complaints within customary limits, or in the case of a purchase for sub-sale, providing for inspection by the subpurchaser; a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for; a clause limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or otherwise limiting remedy in a reasonable manner (see Sections 2–718 and 2–719).
UCC § 2–207, cmts. 4 & 5 (1987).

**20.** *See Eskay Plastics, Ltd. v. Chappell*, 660 P.2d 764, 767 (Wash.App.1983) (holding "that the burden of proof of the existence of these conditions rests on the party who will benefit therefrom").

**21.** *Rottinghaus*, 666 P.2d at 905 ("Since the [warranty disclaimers] materially alter the contracts, they may not be treated as additional terms which became part of the contracts and are therefore not enforceable."). Also note, un-

courts have not had occasion to address the issue, other courts commonly hold that indemnification clauses like ARCO's are "material" as a matter of law.[22] Furthermore, we have found no case where an indemnity clause was held to be "immaterial" under section 2–207. These factors lead us to predict that Washington courts would hold that ARCO's indemnity clause was a material alteration of the parties' contract under section 2–207(2)(b) of the UCC.[23] Therefore, we hold that the clause is unenforceable as a matter of law.

### 4. Alternative Basis for Incorporation of the Indemnity Clause: Express Agreement.

■■■ Notwithstanding the above analysis, ARCO's indemnity clause may be part of the parties' contract provided they expressly agreed to it. That is, if the indemnity provision was expressly agreed to by Western, and thus the confirmation was merely a codification of the parties' earlier agreement, the clause is binding and section 2–207 analysis is unnecessary.[24] Whether ARCO and Western expressly agreed to the indemnity clause is a factual question.

The entirety of the evidence presented by ARCO concerning the formation of its contract with Western consisted of an affidavit by a former order clerk stating that documents "acknowledging or confirming a customer's order" were sent to Western. Even ARCO acknowledged the absence of evidence

concerning contract formation in its briefing of the issue of waiver:

> Had Western . . . raised the issue about its negotiations with ARCO . . . or otherwise called attention to this issue, ARCO . . . would have had the opportunity to conduct discovery regarding the course of dealing and/or actual negotiations between the parties. Since Western . . . conceded that the indemnity provision was a part of the contract, however, there was no need to try to develop such additional evidence.

Since there is an absence of evidence of an oral agreement, it can not be determined whether the parties expressly negotiated for and agreed to the indemnity clause. Thus, we conclude that summary judgment on this alternative theory is not appropriate.

### C. The Superior Court Properly Denied ARCO's Alternative Bases for Summary Judgment.

On cross-appeal, ARCO contends that it is entitled to summary judgment for several additional reasons not relied upon by the superior court. We now address these arguments.[25]

### 1. Western Substantially "Altered" the Beads.

■■■ In its brief, ARCO argues that the superior court failed to consider an alternate basis for granting summary judgment:

> The trial court addressed the question of Western['s] . . . negligence and held that ARCO . . . had raised evidence of West-

like the instant case, in *Rottinghaus*, the disputed clause appeared on written confirmations that were actually signed by both parties. Nonetheless, the court held that, as a material alteration, the clause was unenforceable. *Id.*

**22.** *See Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1335 (7th Cir.1991); *Trans–Aire Int'l*, 882 F.2d at 1260–61; *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 687 F.Supp. 820, 827–28 (S.D.N.Y.1988), *aff'd*, 895 F.2d 1410 (2d Cir.1989); *Charles J. King, Inc. v. Barge "LM–10"*, 518 F.Supp. 1117, 1120–21 (S.D.N.Y.1981); *Maxon Corp. v. Tyler Pipe Indus., Inc.*, 497 N.E.2d 570, 576–77 (Ind.App. 1986); *Brown Mach. v. Hercules, Inc.*, 770 S.W.2d 416, 421 (Mo.App.1989); *Resch v. Greenlee Bros. and Co.*, 128 Wis.2d 237, 381 N.W.2d 590, 593 (App.1985).

**23.** *Cf. Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 641 (9th Cir.1988) (court "assum[ed] [that] Washington courts would accept the traditional view" when Washington law was silent).

**24.** Section 2–207 analysis is triggered only if the indemnity clause was "additional to or different from" the term originally agreed to. *See, e.g.*, AS 45.02.207 and Wash.Rev.Code § 62A.2–207 (1994).

**25.** We are not bound by the reasoning of the trial court and thus are free to affirm a grant of summary judgment on alternative grounds. *Wright*, 824 P.2d at 720. Any matter appearing in the record will be considered in defense of the judgment, even if not passed upon by the lower court. *Id.*

ern['s] ... negligence sufficient to defeat Western['s] ... motion for summary judgment. However, the trial court did not explicitly address *the significance of non-negligent "active participation" or "contribution."*

. . . .

The "active participation" or "contribution" by Western ... in this case, even if such conduct does not constitute negligence, should also bar any recovery by Western.... Because Western ... manufactured and marketed its insulation board, Western ... had to have "contributed to" and "actively participated" in any alleged defect in the "Insulfoam" that it sold.

(Emphasis added.) By stating as such, ARCO is asking us to consider the significance of Western's material alteration of the beads.

ARCO's assertion that Western actively participated in or contributed to any alleged defect in the Insulfoam by altering the beads is an affirmative defense. As ARCO correctly notes, we have held that "[a]ctive participation by the indemnitee in the indemnitor's wrong may preclude recovery on an implied contract theory." *Kandik I,* 795 P.2d at 804; *see also D.G. Shelter Prods.,* 684 P.2d at 842. However, based on this premise, ARCO mistakenly concludes that Western is precluded from seeking implied indemnity.

As for whether Western's "material alteration" of the beads precludes its claim for implied indemnity, the *Restatement (Second) of Torts* is instructive. It states:

**Further Processing or Substantial Change.** . . . It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section. If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison.... On the other hand, the manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it

turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. No doubt there will be some situations, and some defects, as to which the responsibility will be shifted, and others in which it will not.

*Restatement (Second) of Torts* § 402A, cmt. p (1977).

 Though the coffee bean example posed above does not involve a design defect, whereas Western's allegation does, the necessary analysis remains unchanged. "Material alteration," per se, does not preclude indemnity. Instead, the necessary focus is on the alleged defect and whether the alteration actively contributed to it. Applied to this case, if, as a result of Western's processing, the beads became more flammable, and this increased flammability played a role in causing the fire, then Western "actively contributed" to the defect.

Though normally a question of fact, in this instance ARCO has effectively conceded that Western did not actively contribute to the alleged defect, the flammability of the beads themselves. Rather, ARCO argues as follows:

ARCO['s] ... defense is based upon the proposition that Western ... manufactured an insulation product, not that it altered the beads so as to increase their flammability characteristics. The flammability characteristics of the beads have virtually no bearing upon the flammability characteristics of any insulation board as installed or maintained by the [underlying] plaintiffs. The flammability characteristics of the insulation board depends upon the application of the insulation board and the measures employed by users such as the plaintiffs to protect the insulation board from fire.

In essence, ARCO is arguing that Western, either through nonfeasance or malfeasance, caused the ultimate harm. In so doing, ARCO is making two, somewhat implicit, arguments. First, it is arguing that its

beads were not defective. That is, in the words of the *Restatement,* "The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed." *Restatement (Second) of Torts* § 402A, cmt. g (1977). However, whether or not ARCO's beads were defective when delivered is a threshold inquiry, not an affirmative defense, which we discuss in further detail *infra,* §§ III(C)(2) & (C)(3).

Second, ARCO is arguing that, notwithstanding any flammability defect in its beads, Western's subsequent processing of the beads into insulation either caused or contributed to the fire. That is, ARCO argues that Western's marketing, labeling, and inadequate sheathing of its insulation end product, rather than any inherent flammability characteristic of the beads, caused or contributed to the fire. As we stated in *Kandik II,* "A traditional rule of indemnity, however, is that an indemnitee is not entitled to recover if the indemnitee has actively participated in the wrongful acts that caused the damage." 823 P.2d 632, 638 (Alaska 1991).[26]

Whether or not Western's subsequent processing of the beads, rather than the beads themselves, caused or contributed to the damage—the fire—is a factual inquiry. Since the record does not dispositively demonstrate that it was Western's subsequent manufacturing processes that caused or contributed to the fire, ARCO's affirmative defense is not ripe for summary judgment.[27]

### 2. *Who Has Burden of Proof?*

■ ARCO argues that the burden of proof test established by this court in *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871 (Alaska 1979), is inappropriate in this case. *Beck* states:

We hold that the plaintiff need only show that he was injured and that the injury was proximately caused by the product's design. The defendant may then avoid liability for a defectively designed product by proving by a preponderance of the evidence that, "on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design."

*Id.* at 885 (quoting *Barker v. Lull Eng'g Co., Inc.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443, 458 (Cal.1978)).

ARCO contends that *Beck* establishes the "burdens of proof as between an ordinary consumer plaintiff and manufacturer." Thus, the rationale of that decision does not apply to an implied indemnity claim by a manufacturer against one of its raw material suppliers. The rationale of *Beck* is clear. Besides lessening the burdens of plaintiff's prima facie case, this allocation puts the burden of producing the relevant complex and technical evidence on the party who has the most access to and is the most familiar with such evidence. *Id.* at 886.

Contrary to ARCO's assertion, the rationale of *Beck* does apply and the superior court correctly allocated the burden of proof upon ARCO as the bead manufacturer. The product in question in this case is ARCO's beads, not Western's Insulfoam. Western must prove that the beads are defective if it is to receive indemnity. Furthermore, in accordance with the rationale of *Beck,* ARCO is the "party who has the most access to and is the most familiar with" the relevant evidence of the quality of the beads since it manufactured them.

ARCO contends that this case represents an anomaly. It cites the fact that Western's officers were active members of industry groups that conducted in-depth studies re-

---

**26.** *See also Allison Steel Mfg. Co. v. Superior Court,* 20 Ariz.App. 185, 511 P.2d 198, 202–03 (1973) ("It is also true that the retailer of the product, absent active participation in the creation of *the defects causing the injury,* may seek indemnity from the manufacturer whose processes created the defect.") (emphasis added), *quoted in Koehring,* 763 P.2d at 504 n. 7; *cf. Hiller v. Kawasaki Motors Corp., U.S.A.,* 671 P.2d 369, 372 (Alaska 1983) ("A manufacturer, therefore, may introduce evidence that its product was substantially altered after leaving its possession, which

evidence may rebut or overcome the plaintiff's showing that his injuries *were a result of the product defect.*") (emphasis added).

**27.** *See Prince v. Parachutes, Inc.,* 685 P.2d 83, 89 (Alaska 1984) (stating that though "there are multiple factors which may have contributed to the accident[,] ... we cannot as a matter of law hold that [appellee's] alleged failure to warn was not also a proximate cause of the accident").

garding polystyrene beads.[28] However, the *Beck* standard for allocating burdens of proof nonetheless applies in this case because, although Western may be "fully knowledgeable about the combustion characteristics of expandable polystyrene beads," ARCO is no less knowledgeable.[29]

### 3. *Western Offered No Proof as to Defect.*

■ As discussed in detail in section III(A), *supra*, Western must prove that ARCO's beads were defective in order to obtain indemnity. It was for this reason that the superior court correctly denied Western's own motion for summary judgment. In its cross-appeal, ARCO argues that Western failed to offer any proof as to whether ARCO's beads were defective. In support of this contention, ARCO quotes the superior court's finding that Western "offered no proof of defect in ARCO's product." The superior court, however, made this finding in the context of considering Western's motion for summary judgment. When it considered ARCO's cross-motion for summary judgment, the superior court stated:

> Applying the above principles, Western ... need only show that its injury was proximately caused by the product's design; in other words, that it paid the settlement due to the flammability characteristics of the polystyrene beads.... Proximate cause is a question of fact which must be established if Western ... is to be entitled to indemnity.

> As there is a question of fact to [be] established, such must be determined by the trier of fact. Summary judgment based upon ARCO's contention that Western ...

has failed to prove the polystyrene foam was defective is thus inappropriate.

(Citations omitted.) Thus, though Western did not offer sufficient proof of defect to support its own motion for summary judgment, it did offer sufficient proof of defect to defeat ARCO's cross-motion for summary judgment.

### 4. *Western as an "Innocent" Manufacturer.*

■ In its cross-appeal, ARCO misconstrues the meaning and application of the word "innocent" as used in *Fairbanks North Star Borough v. Kandik Construction,* 795 P.2d 793, 803 (Alaska 1990) (*Kandik I* ) ("an innocent party who merely passes on an already defective product in the stream of commerce is entitled to implied noncontractual indemnity from the product producer"), *vacated in part on other grounds,* 823 P.2d 632 (Alaska 1991). ARCO argues that since Western manufactured and marketed Insulfoam and altered the component beads, it is not "innocent" and thus is precluded from asserting its implied indemnity claim. However, "innocent," as applied in these cases refers to the general proposition that a party's own negligence bars a claim for implied indemnity. As such, it provides for an affirmative defense and does not preclude Western from asserting an indemnity claim.[30]

### 5. *Western's Settlement Included Negligence Claims.*

■ ARCO argues that Western should not be entitled to recover implied indemnity since Western paid to settle a negligence claim. ARCO argues that the settlement establishes negligence on the part of West-

---

28. ARCO asserts:

Western ... was fully knowledgeable about the combustion characteristics of both the expandable polystyrene beads and its own Insulfoam insulation. That knowledge [was] gained from Western['s] ... activities as a member of The Society of Plastics Industry (SPI) and as a sponsor of full scale flammability studies.

(Emphasis omitted.)

29. ARCO had representatives participating on the panels of these same industry groups.

30. ARCO is entitled to assert, and in fact has asserted, that Western's independent negligence precludes indemnity. *See,* note 10, *supra.* How-

ever, as the superior court correctly stated when considering ARCO's cross-motion for summary judgment, "[T]his is only evidence and issues of material fact regarding alleged negligence must be determined by the trier of fact. Summary judgment is inappropriate on th[is] basis." Consequently, ARCO's evidence, though sufficient to defeat Western's motion for summary judgment, was insufficient to support its own motion for summary judgment. *See Lillegraven v. Tengs,* 375 P.2d 139, 142 (Alaska 1962) ("Issues of negligence are ordinarily not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner.").

ern, and thus bars Western from seeking indemnification from ARCO. However, ARCO's argument, an estoppel claim, is misguided. Western's settlement offer with the NSB explicitly denies any fault. It states, "Releasors understand that this settlement is in compromise of a disputed claim and that the payment *is not to be construed as an admission of liability on the part of the persons and entities hereby released....*" (Emphasis added.) In short, Western's settlement agreement with the NSB in no way establishes Western's liability.

### D. *Attorney's Fees.*[31]

The superior court held that ARCO's express indemnity provision controlled, and thus awarded full attorney's fees to ARCO.[32] Whether the award of attorney's fees was proper is entirely dependent upon whether ARCO's indemnity provision was part of the parties' agreement. Since, for reasons discussed above, we have concluded that the indemnity provision is unenforceable, the superior court's award of attorney's fees must be set aside.

## IV. *CONCLUSION*

Western's motion for summary judgment was properly denied because (1) It failed to prove that ARCO's beads were defective; and (2) ARCO has sufficiently raised a genuine issue of material fact as to Western's independent negligence. ARCO's motion for summary judgment was improperly granted since the express indemnity provision relied upon is unenforceable. Furthermore, no alternative ground advanced by ARCO in its cross-appeal supports summary judgment. Accordingly, the judgment of the superior court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

EASTAUGH, J., not participating.

---

**31.** "Review of attorney's fees based on indemnity is a question of law which we may review *de novo.*" *Koehring,* 763 P.2d at 509 (citations omitted).

**32.** In *Manson–Osberg Co. v. State,* 552 P.2d 654 (Alaska 1976), we stated:

As to the matter of attorney's fees, we find that there was no error in an award of full attorney's fees in this matter. While Civil Rule 82 would normally only allow an award which would "partially compensate" the prevailing party, we hold that the "hold harmless" indemnity clause should include the cost of recovery on the clause itself, as a matter of policy.

*Id.* at 660 (footnote omitted).